UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JAMES HEARNS, JR.,                    :     Case No.        1:02cv00496
                                      :
            Plaintiff,                :     (Judge Bertelsman)
                                      :
    vs.                               :
                                      :
JEFF WYLER FAIRFIELD, *et. al.,*      :
                                      :
            Defendants.               :
                                      :

---

## PLAINTIFF JAMES HEARNS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Bryan R. Perkins (0061871)
119 East Court Street
Suite 314
Cincinnati, Ohio 45202
(513) 632-5335
(513) 721-5824 Fax
Bperkins@CourtStreetEast.com

*Trial Counsel for Plaintiff,*
*James Hearns, Jr.*

Donald W. White, Esq.
Elizabeth Mason, Esq.
Nichols, Speidel & Nichols
237 Main Street
Batavia, Ohio 45103

*Trial Counsel for Defendants,*
*Jeff Wyler Fairfield, Inc., et. al.*

COMBINED TABLE OF CONTENTS AND SUMMARY

I.      FACTUAL SUMMARY……………………………………………………….. 2

II.     ARGUMENT………………………………………………...…………… 19

    A.    Standard for granting summary judgment………………………...…………… 19

    Primary Authority Cited:

            Fed. R. Civ. P. 56…………………………………………...………… 19
            *Ivy Street Corporation v. Alexander*, 822 F.2d 1432
                (6th Cir. 1987)…………………………………………...………… 19
            *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
                106 S. Ct. 1348 (1986)………………………….………… 19

    B.    Defendants are not entitled to summary judgment on Hearns' claims of racial
          discrimination (Counts 1 and 2) as Hearns has established a prima facie case of
          racial discrimination and a hostile work environment………………………….. 20

    Primary Authority Cited:

            42U.S.C. § 2000e-2(a)(1)……………………….………………………..20
            *Hafford v. Seidner*, 183 F.3d 506 (6th Cir. 1999)………………….…….20,21
            *Crawford v. Medina Gen'l* Hospital, 96 F.3d 830 (6th Cir. 1996)……….20
            *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405
                (6th Cir. 1999)……………………………………………...20, 33
            *Harris v. Forklift, Sys.*, 510 U.S. 17, 114 S.Ct. 367 (1993)…………..….21
            *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702,
                98 S.Ct. 1370 (1978)…………………………….………………22
            *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399..22, 28, 29
            *Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933 (6th Cir. 2000) ...22
            *Firefighters Institute for Racial Equality v. St, Louis*, 549 F.2d 506
                (1977)…………………………………………………………..22
            *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801,
                93 S.Ct. 1817 (1973)……………………………………..…23
            *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) …………. 23
            *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001)…………..23
            *Dasco v. The Grafton School, Inc.,* 181 F. Supp.2d 485 (D. Md. 2002)...23
            *NLRB v. Foundry Div. of Alcon Induc., Inc.,* 260 F.3d 631
                (6th Cir. 2001)……………………………………………………23

*Jackson v. Quanex Corp.,* 191 F.3d 647 (6th Cir. 1999)……........24, 26, 28
*Moore v. Kuka Welding Sys.,* 171 F.3d 1073 (6th Cir. 1999)……………24
*Bowen v. Missouri Dept. of Social Services*, 311 F.3d 878
(8th Cir. 2002)…………………………………………….………24
*Price Waterhouse v. Hopkins*, 490 U.S. 228, 120 S.Cr. 2097…………...25
*Dickerson v. State of New Jersey Dept. of Human Services,* 767 F. Supp.
605 (D.N.J. 1991)………………………………………………...25
*Harris v. International Paper Co*., 765 F.Supp. 1509 (D. Me. 1991)…...25
*Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999)………..26
*Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir. 1994)…….30
*Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275 (1998)…30
*Karibian v. ColumbiaUniversity*, 14 F.3d 773 (2nd Cir. 1994)………….30
*Clark v. UPS*, 400 F.3d 431 (6th Cir. 2005)……………………………...30
*Johnson v. UPS, Inc.,* 2004 U.S. App. LEXIS 23795 (6th Cir.)…….…….34

C.      Defendants are not entitled to summary judgment on Hearns' claim of retaliation (contained within Counts 1 & 2) as Hearns has established a prima facie case of retaliation………………………………………………………………...…………..39

        Primary Authority Cited:

        *Wrenn v. Gould*, 808 F.2d 493 (6th Cir. 1987)……………..…………40

D.      Defendants are entitled to summary judgment on any section 1983 claim…....…42

        Primary Authority Cited:

        42 U.S.C. § 1983……………………………………………………42

E.      Defendants are not entitled to summary judgment on Hearns' American with Disabilities Act ("ADA") claim (Count 3) because his ADA claim grew out of his racial discrimination claim………………………………………...…………...43

        Primary Authority Cited:

        *Jones v, Sumer Retirement Village*, 209 F.3d 851 (6th Cir. 2000)……….42
        *Davis v. Sodhexo*, 157 F.3d 460 (6th Cir. 1998)………………………42
        *Aug v. Proctor & Gamble Co.,* 932 F.2d 540 (6th Cir. 1991)………..… 42

F.      Defendants are not entitled to summary judgment on Hearns' state claim of Disability Discrimination…………………………………………...…………43

        Primary Authority  Cited:

        Ohio Rev. Code § 4112.02……………………………………...………..43

G.     Defendants are entitled to summary judgment on Hearns' claim of retaliation for filing a worker.s compensation claim………...…………………………………43

III.     Conclusion…………………………………………………………………….………43

IV.     Certificate of Service………………………………………………….……………44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


| | | |
|---|---|---|
| JAMES HEARNS, JR., | : | Case No.        1:02cv00496 |
| | : | |
| Plaintiff, | : | (Judge Bertelsman) |
| | : | |
| vs. | : | |
| | : | |
| JEFF WYLER FAIRFIELD, *et. al.,* | : | **PLAINTIFF'S RESPONSE** |
| | : | **TO DEFENDANTS' MOTION** |
| Defendants. | : | **FOR SUMMARY JUDGMENT** |
| | : | |

Now comes the Plaintiff, James Hearns, Jr., by and through his undersigned counsel, and hereby moves this Honorable Court to deny defendants' motion for summary judgment.  Plaintiff submits that a review of the record, in a light most favorable to him, demonstrates that there are material issues of fact in dispute, and the defendants are not entitled to judgment as a matter of law. (See Memorandum in Support attached hereto.)


Respectfully Submitted,

/s/ Bryan R. Perkins

Bryan R. Perkins (0061871)
Trial Counsel for Plaintiff
119 E. Court Street
Suite 314
Cincinnati, Ohio 45202
(513) 632-5335
(513) 721-5824 Fax
BPerkins@courtstreeteast.com

1

## MEMORANDUM IN SUPPORT

## I.     FACTUAL SUMMARY

**A.     Introduction**

James R. Hearns, Jr., is an African-American man. He is also an honorably discharged veteran of the United States Army.  Hearns began his career as a car salesman with Jeff Wyler in 1996.  After six years of service to Jeff Wyler, Hearns was terminated in April of 2002. During his employment at Jeff Wyler, Hearns was subjected to repeated instances of racial discrimination and harassment at the hands of Wyler's employees and supervisors. Hearns was subject of derogatory racist comments, he received racist notes inscribed with the word "Nigga," and saw black dolls "lynched" at the Wyler dealership.  Hearns was denied many of the benefits that were given to white employees.  He was treated less favorably than white employee. Hearns was humiliated and shamed in the presence of other employees. He was treated as a lesser person because of his race. Wyler's management implemented punitive policies that applied only to Hearns, but not to white employees. Hearns was disciplined, reprimanded, and suspended for conduct, which if committed by a white person, was perfectly acceptable. Hearns was also disciplined for infractions that were simply fabricated, in an attempt to "build a file," or to provide a pretext for disciplining him.  In sum, while at Jeff Wyler, Hearns was mercilessly subjected to a racially charged and hostile work environment.  Through this lawsuit, Hearns stands before this Court seeking justice.

**B.     Racist Notes and Lynched Dolls.**

The racist mind-set that was engrained in the Wyler dealership manifested itself almost immediately after Hearns began at Jeff Wyler.  On at least six occasions between June 1996 and

1997, Hearns discovered notes left on his desk that contained hateful and offensive racial comments. These notes included ads that contained pictures of gorillas and monkeys, and had the word "Nigga" written across them. On at least two occasions Hearns found a black doll left hanging from a window blind cord. The cord was wrapped around the doll's neck in a noose, as if it had been "lynched." Hearns complained about these incidents to the general manager, Mark Kattran, and the new car manager, Mark Ashworth. But absolutely no measures were taken to investigate or correct the problem. Kattran told Hearns "not to worry about it." (Appendix, Exhibit A, Hearns Aff. at. ¶¶ 6-13)

Because racism was so deeply embedded at the Jeff Wyler dealership, the abuse of Hearns was not an isolated incident. Through its own investigation, Jeff Wyler learned that Ramone Humphrey, also an African-American salesperson, received similar treatment. Around 1997, Humphrey found on his desk, a picture of a black man with a rope around his neck. Humphrey too complained to Ashworth, but as always, no remedial action was taken. The matter was simply "shrugged-off." (Hearns Aff. at ¶ 14; Appendix, Exhibit B, Statement of Ramone Humphrey at p. 2[1])

## C.    Blacks, Heathens and Leeches.

As early as 1998, Hearns began complaining about the evident racist attitude of Cary Wallach, the finance manager at Jeff Wyler. Hearns noticed that Wallach would give preferential treatment to white customers by moving them ahead of black customers in the financing line, even though the black customers had been waiting longer. Wallach never advanced black customers ahead of white customers. As this conduct continued, Hearns complained of this apparent discriminatory conduct to Tony Gomez, the general manager.

---

[1]    The statement from Ramone Humphrey was provided to Hearns through the discovery process by defendants counsel, and was part of Wyler's own investigation. Hearns also witnessd many of the instances of discrimination against Humphrey.

However, Gomez refused to investigate or correct the matter, and simply ignored Hearns' complaints. Gomez and Wallach were "buddies" and Gomez would support Wallach, regardless of the behavior of Wallach. (Hearns Aff. at ¶¶ 15-20; Hearns Depo. at p. 105)

Around the fall of 1999, Wallach's dislike of blacks became even more open and obvious. Wallach made racist statements about Hearns' black customers. Wallach referred to Hearns' African-American customers as "them people," "leeches," and "heathens." Wallach would use the word "nigger" to Hearns on almost a daily basis. Hearns again complained to the general manager, Tony Gomez, about Wallach's racist comments. As usual, Gomez ignored Hearns' complaint and refused to take any corrective action. (Hearns Aff. at ¶¶ 21-23; Hearns Depo. at p. 88)

On one occasion, Hearns steadfastly objected to Gomez's lack of correction and refused to leave Gomez's office until the matter was addressed. Gomez was agitated by Hearns' demand that action be taken against Wallach. Eventually, Gomez sent Wallach home for a half day. This was an empty gesture intended to placate Hearns because no meaningful corrective or disciplinary action was taken against Wallach. (Hearns Aff. at ¶¶ 24-26)

Shortly afterwards, Wallach confronted Hearns in the parking lot and threatened him. Wallach warned Hearns that he was going to "get him." Hearns again complained to his general manager, Tony Gomez. Gomez just laughed and disregarded Hearns' complaint. Gomez took no corrective action against his fellow manager, despite the fact that Wallach had made racial slurs and threatened Hearns. (Hearns Aff. at ¶¶ 27-28)

Wallach also expressed his hatred of Hearns' black clientele to others. Wallach told Teresa George, then administrative assistant to the general manager, that he "was tired of [Hearns] bringing those nigger customers in here." (George Aff. at ¶ 2)

4

**D.    Hearns is Suspended on a Pretense.**

About a month after Wallach threatened to "get" Hearns, Gomez suspended Hearns for failing to work on a scheduled day. Hearns explained he had switched scheduled days off with Bob Ernst, and that he was not supposed to work on the day at issue. But, this scheduling arrangement made no difference to Gomez. At this point, Gomez's animosity towards Hearns became even more evident. When Gomez suspended Hearns, he stated: "I don't like you and you don't like me." When Hearns explained that he had three customers to deliver vehicles to on the days he was to be suspended, Gomez indicated that it was "too bad." (Hearns Aff. ¶¶ at 29-35)

No white salespeople were treated in such a hostile manner. White employees regularly switched their scheduled days off and suffered no adverse consequences. (Hearns Aff. at ¶ 34)

**E.    "You Black People are All Alike."**

Sometime in 1998-1999, Duncan Riddle, a co-salesperson, subjected Hearns to racist comments. Hearns and Riddle admittedly did not get along well. Riddle, like Wallach, was an unabashed racist who did not hide his prejudicial feelings.   Hearns requested that Riddle just stay away from him.   Riddle responded by stating "you black people are all alike."   This statement was made in the middle of the showroom where the Wyler staff and customers could hear.   Hearns reported the racist statement to Jerry Bittner, a new car sales manager.   Bittner ignored Hearns' complaint and took no corrective or disciplinary action against Riddle.   (Hearns Aff. at ¶¶ 36-42)

**E.    Supporting a Black Person at Jeff Wyler Could Get One Thrown in Jail.**

Wyler employee, Carla Combs, had witnessed Riddle make a racist comment. Combs believed that Hearns was a victim of unfair discrimination by Wyler management and she gave a statement of the incident to Jerry Bittner, the new car sales manager. Wyler's management

became upset with Combs for supporting Hearns. (Hearns Aff. at ¶¶ 43-44) The retaliation against Combs proved to be severe.

Wyler's management accused Combs of stealing money from the dealership. She was terminated and charged with theft. These charges were later proved to be baseless and were ultimately dismissed. (Hearns Aff. at ¶¶ 45-47) While the charges were bogus, the message was clear. . . if you oppose discrimination at the Wyler dealership, you will pay gravely.

Riddle was not reserved about his racism. On another occasion when Teresa George, administrative assistant at Jeff Wyler, was showing pictures from her vacation that depicted her and an African-American friend, Riddle gave the photographs back and said he didn't want to look at "nigger pictures." (Appendix, Exhibit D, George Aff. at ¶ 2)

## G.    Threatened Retaliation if Hearns Continues to Complain of Discrimination.

Sometime around 1999, Chuck Adomitis, a manager at Wyler, became aware of a letter sent to Jeff Wyler from Ozzie Davis III, the President of Unified Sports Management, Inc. (Hearns Aff. at ¶ 48; Appendix, Exhibit C, Letter from Ozzie Davis)  Mr. Davis was concerned about the manner in which one of his clients, Akili Smith (former Bengals quarterback), was treated by Cary Wallach. The gist of the letter was a request for Jeff Wyler to end the obvious racism at his dealership. (Hearns Aff. at ¶¶ 48-50; Exhibit C)

Adomitis became upset, as he always did, when someone complained of racism. Adomitis accused Hearns of being a troublemaker and threatened him with termination if he continued with his complaints of racial discrimination.  Also, around the same year, Hearns was taken into Tony Gomez's office and warned that he would be punished if his claims of discrimination caused any disruption in the sales force.  (Hearns Aff. at ¶¶ 51-53)

## H.    Steal from the Black, and Give to the White.

Early in 2001, and on other occasions, Margaret Ingram, the special finance manager at the dealership, contacted one of Hearns' established customers who had been working a deal with Hearns. The manager asked the customer to finish the deal with a white-female salesperson. (Hearns Aff. at ¶ 54; Hearns Depo. at p. 154)

On one occasion, the customers wondered why the deal was taken away from Hearns. While the deal was being completed, Margaret Ingram, the finance manager, made inappropriate sexual comments to Hearns in the presence of the customers. The customers were upset about the deal being taken away from Hearns and the disrespectful manner in which Ingram treated him. (Hearns Aff. at ¶¶ 54-55) The matter was reported and disciplinary action was taken. (Hearns Aff. at ¶¶ 61-62) But when one looks at the disciplinary action taken by Wyler management, its racial animus becomes undeniable.

Shockingly, it was Hearns who was reprimanded. It was Hearns who had a deal stolen from him and given to a white salesperson. It was Hearns who was the recipient of sexually inappropriate contact and improper comments by Ingram in the presence of Wyler customers. But oddly, it was Hearns who was reprimanded. Obviously, Wyler was "building a file" against Hearns so it would be able to rid itself of him or justify its conduct with some race-neutral pretextual reasons. Gomez claimed that Hearns must have put the customers up to making the complaint, but this was not true. The customers came by themselves and went directly to the general manager's office and expressed their disgust to Gomez's administrative assistant, Teresa George. (George Aff. at ¶ 3) Even though they complained to Gomez about Ingram, Gomez punished Hearns.

White salesmen never had deals taken from them by a manager. And Hearns never witnessed white salespersons disrespected and sexually harassed in this manner by managers in the presence of customers. (Hearns Aff. at ¶¶ 59-60; Hearns Depo. at p. 155)

It is also worth noting that Margaret Ingram, a white woman, received no significant discipline for making sexually suggestive comments and physically touching Hearns in front of customers. Her conduct included rubbing Hearns' shoulders, complimenting him on his physique, and referring to him as "sweet heart," "my baby," and "honey." Her conduct was so sexually charged that Hearns' customers wondered if Ingram and Hearns were romantically involved, which they were not. (Hearns Aff. at ¶¶ 56-58; Hearns Depo. at pp. 70, 156)

Ironically, about two weeks or so after this incident, Tony Grove, a black salesman, was terminated when it was alleged he made improper sexual comments to Margaret Ingram. When Ingram got a difficult customer financed, Grove was so happy he told Ingram that he could give her a kiss. When the comment was reported, Tony Gomez terminated Grove. Gomez claimed Jeff Wyler had a "zero tolerance" policy when it came to sexual harassment. (Hearns Aff. at ¶¶ 63-66)

In reality, the zero tolerance only applied if the alleged perpetrator was black. If the harasser was white, as with Ingram, Jeff Wyler was significantly more charitable. Also, white employees Brett May and Jake Ashendorf were found to have committed sexual harassment by playing pornographic videos in the breakroom at the Eastgate dealership. Despite protests by women employees who turned-off the videos, they turned the video back on and continued to watch the pornography. They were not terminated, but were merely transferred to the Fairfield dealership. (George Aff. at ¶ 4)

Ashendorf later committed another instance of sexual harassment at the Fairfield store. This time he simulated "humping" a black-male employee in the behind. Ashendorf was still not terminated, but was transferred to the Forest Fair dealership. (When the Forest Fair dealership closed, he went to the Colerain store). (George Aff. at ¶ 2)

The conduct of Ashendorf and May was much more egregious than the somewhat innocuous comment of Grove. But Grove, who was black, was immediately terminated, and never given the chance for a transfer to another dealership the way the white perpetrators were.

**I.      Flipped Deals: For Whites Only.**

As early as 1996, Hearns began complaining about the discriminatory manner in which managers handed out "flipped" deals.  A "flipped" deal was one in which a member of Wyler's management team would refer a deal to a salesman to write-up.  Essentially a salesman would get paid a commission from a sale that did not originate from his own efforts, but rather from a deal that was given to him by a member of the management team.  (Hearns Aff. at ¶¶ 66-69)

These "flipped" deals were only given to white salesmen. Hearns was not given a "flipped" deal during his time at Wyler.  Receiving "flipped" deals made it easier for white employees to meet their sales quota and also increased their income.  But this was a benefit only doled-out to white employees. (Hearns Aff. at ¶¶ 70-71)

Hearns complained about this discriminatory conduct often during his employment at Jeff Wyler. Despite complaints by Hearns to managers, Chuck Adomitis and Jerry Bittner, no corrective action was taken, and Hearns was written-off as a troublemaker. (Hearns Aff. at ¶ 70; Hearns Depo. at p. 107)

**J.      The Black Protester Gets the Water Hose.**

Sometime around 1996-1997, Hearns sold a Cadillac to a black customer, Kim Trosper. She complained because she felt she was being treated badly by Wyler's service department. Hearns referred her complaint to the manager, Chuck Adomitis, for resolution.  After speaking with Adomitis, Kim became more frustrated, and expressed her feeling that Adomitis was an obvious racist.  She became so upset about her poor treatment that she decided to picket the Wyler dealership.  When Adomitis discovered Kim picketing outside with her small children, he cursed at her and demanded that she leave the dealership. Kim ignored Adomitis and continued picketing. (Hearns Aff. at ¶¶ 72-78)

Adomitis then came into the dealership and yelled at Hearns in the presence of other salespeople and customers. Adomitis threatened Hearns that if he did not get Kim to leave the dealership he would be in trouble. Hearns tried to explain to Adomitis that he could not control the conduct of a third-party. (Hearns Aff. at ¶¶ 79-80)

Hearns and Ramone Humphrey (another African-American salesman) overheard Adomitis tell Jerry Bittner to inform a "lot tech" to go outside and pretend to wash the cars with the water hose, and then to spray Kim and her small children with water. After the "lot tech" sprayed Kim and her children with water, she left the dealership.  Hearns was deeply angered and disgusted with Adomitis.  Hearns told Adomitis that if Kim had been white, he would not have ordered her sprayed with a water hose.  (Hearns Aff. at ¶¶ 81-85)

**K.    Hearns is Injured at Work.**

In August of 1999, Hearns was injured on the job, and was put on restricted duty of no more than 6 hours a day. In November of 1999, Hearns was reprimanded for selling only 6 cars when the quota was 8. He was warned that he would be terminated if he did not meet the quota by the end of December. (Hearns Aff. at ¶¶ 86-88; Hearns Depo. at p. 158)  Hearns was punished

despite the fact that he was on limited duty as ordered by his doctor, and also did not receive the benefit of deals flipped to him by management.

Also, Bill Adkins harassed Hearns after he had filed for Workers Compensation as a result of this injury. Adkins insulted Hearns for not being able to work a full 8-12 hour day. This harassment continued despite the fact that Hearns was under a doctor's care. (Hearns Aff. at ¶ 89) Also, Jeff Wyler's management never reduced Hearns' monthly sales quota, even though he was only working part-time. (Hearns Depo. at 132) This unfair treatment made it a foregone conclusion that Hearns would be unable to meet his required quota. When Hearns failed to meet his quota, Wyler would be able to further punish Hearns.

Hearns was not the only African-American salesman who was harassed following an injury. Chuck Adomitis berated Ramone Humphrey (also African-American), after he had to be off work due to an ankle injury. Humphrey had to return to work early in order to avoid being fired by Adomitis. White employees were not abused in this manner. (Hearns Aff. at ¶¶ 90-91; Humphrey's Statement, Exhibit B)

**L.      Just Because We Call You a Nigger, Does Not Mean We Discriminate.**

In this day and age, it would be disingenuous to suggest that one can use the "N" word in the workplace on one day, and then the next day, claim that adverse action taken against a black employee was completely void of any racial motivation. The "N" word rang loudly throughout the halls of Jeff Wyler.

Teresa George, an employee at Wyler, heard Duncan Riddle and Cary Wallach use the word "nigger" on numerous occasions when referring to Hearns and his black customers. (George Aff. at ¶¶ 3-4) Ramone Humphrey heard Bill Flynn say "nigger" while talking on the telephone. (Humphrey's Statement, Exhibit B)

Barbara Chaney, former employee of Jeff Wyler, heard Cary Wallach (finance manager) and Duncan Riddle, refer to Hearns as a "Nigger." In 2001, Riddle referred to Hearns as "The Nigger," and indicated he did not want to work with him. (Appendix, Exhibit E, Chaney Aff. at ¶¶ 1-5)

**M.    Demos: Different Rules for Blacks.**

Tony Sanders, a black man, applied for and received a position as special finance manager with Jeff Wyler. Sanders was to be the first black manager at Jeff Wyler since Hearns began employment there. Hearns was happy about the prospect of a black manager being hired at Wyler. He had hoped that this would at least help bring an end to the racist attitudes that were prevalent at the dealership. Unfortunately, it would not come to pass. (Hearns Aff. at ¶¶ 92-99)

All managers are ordinarily given demo vehicles to drive. However, managers Chuck Adomitis and Steve Kaiser advised Sanders that he would have to wait 30 days before he would be given a demo vehicle. Wyler had immediately given white managers demos. Hearns testified that, "white managers as soon as they are hired, they go pick a car." Sanders had just come to town and needed the expected vehicle. Sanders insisted on the demo. Adomitis and Kaiser refused to budge on the issue, and ultimately Sanders declined the position for this reason. (Hearns Aff. at ¶¶ 95-102; Hearns Depo. at pp. 84-85)

Sanders had confided in Hearns about his unfair treatment. Hearns let Adomitis and Kaiser know that the way they treated Sanders was wrong, unfair, and smacked of racism. After all, the white managers hired prior to Sanders all received their demo vehicles immediately. Adomitis and Kaiser warned Hearns to mind his own business. (Hearns Aff. at ¶¶ 101-106; Hearns Depo. at pp. 85-86, 98, 100)

**N.    Company Cars: For Whites Only.**

It was routinely accepted at Jeff Wyler that a salesman could use a company vehicle if his personal car was broken down or if they had to report to corporate headquarters on company business. Salesmen were also permitted to use company cars for promotional reasons.  (Hearns Aff. at ¶ 107)

When Hearns' personal vehicle broke down, Chuck Adomitis prohibited him from using a company car. When Hearns was required to report to corporate headquarters, his requests to use a company car were denied. But, white salesmen were permitted to use company cars for any of the above stated reasons. John Heekin, a white salesman, was even allowed to use a company car for several days at a time. He was even given permission to use company cars on many non-work related occasions, including traveling to AA meetings. (Hearns Aff. at ¶¶ 107-109; Hearns Deposition at p. 212)

Adomitis denied Ramone Humphrey (an African-American salesman) the use of a company car for promotional means.  Adomitis also prohibited Humphrey from using a company car when his personal car broke down. But Adomitis permitted white employees to do so when requested. (Statement of Humphrey, Exhibit B)

O.      **Gomez Shackles Hearns.**

Around October of 2001, Tony Gomez implemented an informal adverse policy that applied only to Hearns. Gomez advised Hearns that if Hearns saw an established customer come into the dealership, and the customer did not specifically ask for Hearns, Hearns was prohibited from approaching or speaking to the customer. This policy, only applicable to Hearns, prevented Hearns from profiting from what were known as "split deals" in which two salesmen split the commission from a sale when one salesman has initial contact with a customer, and another

salesman finishes the deal. This punitive policy was not applied to similarly situated white employees. (Hearns Aff. at ¶¶ 110-112; Hearns Depo. at 68-69)

Also, during this time, Hearns had transferred to used cars. White salesman would lie to Hearns' established customers when they came into the dealership and ask for him. They would tell his established customers that Hearns "could not" sell them a Cadillac because he moved to used cars. This was blatantly untrue. The white salesman would then do the deal and get paid the commission. (Hearns Depo. at p. 66)

**P.    On Leave? Whites Welcome -- Blacks Stay Away.**

Around October of 2001, while on leave, Hearns arrived at the dealership to retrieve personal property from his desk. Rob Long, acting under the direction of Tony Gomez, told Hearns he was not allowed to be at the dealership while on leave as it was against company policy. If such a policy did exist, it was applied discriminately. As an example, Peggy Arguella, a white salesperson, was on leave for 7-9 months. While on leave she would come to the dealership 2-3 times a month and nobody said anything to her. Amy Jones, a white employee, who was on short-term disability leave, would periodically come to the dealership without objection. This adverse policy was applied only to Hearns. (Hearns Aff. at ¶¶ 114-117)

**Q.    Building the File: Gomez Accuses Hearns of Stealing a Customer.**

Around October of 2001, Hearns was called into a meeting with the general manager, Tony Gomez, and John McGuire. Gomez wrongfully accused Hearns of stealing a customer from a white salesperson. Gomez lied and claimed he had three witnesses who saw Hearns go into another salesperson's office, remove paperwork, and call the customer. Gomez refused to identify his supposed witnesses. In reality, this was merely a shameful attempt by Gomez to build a file against Hearns. But before management could punish Hearns for this farce, it was

14

revealed that Paul Conrad from the service department had referred the customer at issue to Hearns. There were no witnesses who saw Hearns steal the customer's paperwork, because it was a blatant lie. The customer belonged to Hearns all along. (Hearns Aff. at ¶¶ 118-121)

Also, while speaking of "building the file," there were numerous disciplinary reports located in Hearns' file during the discovery process that he had never seen before. And which have never been discussed with Hearns.   (Hearns Depo. at pp. 133-134)

## R.    The Pretext Continues: Hearns Punished for Getting Medical Treatment.

Wyler's management was undaunted by its failed attempt to take adverse action against Hearns through its fabricated story of Hearns stealing a customer. Another, but no less ridiculous, opportunity to punish Hearns would quickly present itself to Wyler's management.

A sales meeting was scheduled at the Wyler dealership on a Saturday in October of 2001. The Wednesday prior to the meeting, Hearns provided Bill Adkins (manager) and Rob Long (assistant manager) with written verification of a doctor's appointment for the following Saturday. Hearns did so as he was required to document all of his doctor's appointments to avoid being harassed by Wyler's management. White employees did not have to do this. Adkins harassed Hearns about his injury and doctor's appointments on a daily basis. (Hearns Aff. at ¶¶ 122-124; Hearns Depo. at p. 65)

Hearns was not even aware of the Saturday meeting until the Friday prior to the Saturday meeting, when Rob Long called him to advise him of the meeting. Hearns told Long that he would not be able to attend due to his scheduled doctor's appointment. Long stated: "okay." (Hearns Aff. at ¶¶ 124-125)

The following Monday, when Hearns returned to work, he brought written verification that he was in fact at his doctor's office on Saturday. Despite this, Hearns was given a three-day

suspension by Adkins for not attending the meeting. (Hearns Aff. at ¶¶ 126-128; Hearns Depo. at pp. 54-55)

**S.    Other Instances of Harassment and Disparate Treatment.**

When Hearns first started at Wyler in 1996, Jeff Dickson, a white salesman won Salesman of the Month. The award was celebrated with much pomp and a big celebration. When Hearns won this award there was no celebration. The award was simply left on his desk with no acknowledgement or fan-fare. (Hearns Aff. at ¶¶ 130-131; Hearns Depo. at pp. 54-55)

Even fellow salesman, Ramone Humphrey, found the manner in which Hearns' plaques for salesmanship awards were simply left on his desk to be appalling. Humphrey observed that when white employees won the award, a big deal was made of it. (Plaintiff's Appendix, Exhibit B)

When Hearns won Salesman of the Year, he did not timely receive his bonus check. When Hearns complained to Chuck Adomitis about not receiving his check, Adomitis "went off" and cussed at Hearns in a very disrespectful manner in the presence of another employee. Adomitis told Hearns he would "get it when he gets it. Don't say anything more about it." Similarly situated white salespersons were not yelled and cussed at for asking a question. (Hearns Aff. at ¶¶ 132-133; Hearns Depo. at p. 94)

In 1997, Hearns' suit coat was stolen. When Hearns called the police, the suit coat mysteriously reappeared the following day. Also, the tires on Hearns' personal vehicle were slashed while he was at work.   (Hearns Aff. at ¶ 134; Hearns Depo. at p. 73)

In 1997-1998, a check was stolen from Hearns' desk. The white salespeople at Jeff Wyler found the theft to be amusing. (Hearns Aff. at ¶ 135; Hearns Depo. at p. 72)

Around December of 1998, Hearns was supposed to receive a fast-start bonus check. The check was delayed for unexplained reasons. (Hearns Aff. at ¶ 136)

Around October of 1999, Adomitis accused Hearns of being armed with a firearm after he saw him with a cell phone. No white salesmen were accused of being armed with a gun when seen with a cell phone. (Hearns Aff. at ¶ 137)

Cary Wallach publicly reprimanded and screamed at Hearns for retrieving copies of past deals from Wallach's office. White salesmen commonly did this and they were not reprimanded for the same conduct. Hearns reported the degrading incident to Tony Gomez. Gomez took no corrective or punitive action against Wallach. (Hearns Aff. at ¶¶ 138-139)

In 1999, Hearns parked his car in the Customer Service area. At the time, the Customer Service department was closed because it was a Saturday. Employees commonly parked there when the Customer Service department was closed. Chuck Adomitis told Hearns to move his vehicle and that he could not park there. Two white employees (Larry Hall and Cathy, a receptionist) were parked in the same area, and Adomitis did not ask them to move their cars. Again, there were rules for white employees and different rules for black employees. (Hearns Aff. at ¶¶ 140-141; Hearns Depo. at pp. 81-82)

In 1999, Hearns' Rolodex, customer book, and paperwork from all his deals were stolen from his office. (Hearns Aff. at ¶ 142) Hearns' customer book was stolen on numerous other occasions. (Hearns Depo. at p. 73) After 1999, Hearns customer book, ink pen, and a recording device were stolen from Hearns' office. The recording device was mysteriously returned before the police arrived. (Hearns Depo. at p. 78)

Hearns' briefcase would be taken and put back. Bill Flynn, a white salesman, told Hearns that a "nigger shouldn't have a briefcase like that." Hearns reported the incident to management,

but nothing was done. Jeff Wyler management allowed Bill Flynn to "get away with murder." (Hearns Depo. at p. 76)

On another occasion, in the presence of Hearns, Flynn made a racist comment to a black customer who had a white wife. Flynn commented that the man was living "a nigger dream," in that he was buying a Cadillac and had a white wife. (Hearns Depo. at p. 77)

Hearns was tired of Flynn's racist comments and he was not going to allow him to keep calling him a "nigger" all the time. At one point, Hearns asked Flynn to step outside. Flynn responded: "I ain't fighting no nigger, I ain't got time for this." (Hearns Depo. at p. 77)

Cary Wallach would constantly yell at and demean Hearns when he tried to complete his deals in the finance office. But nothing was said to white salespeople who did the same. (Hearns Aff. at ¶ 144)

Ramone Humphrey also experienced other incidents of a racial nature during his short period of employment at Jeff Wyler. On one occasion, Humphrey attended a company picnic. Humphrey and his family were the only blacks at the picnic. When he won a $ 500.00 prize, the only person who clapped was Jeff Wyler.  Humphrey also noticed that when blacks left Jeff Wyler they were never rehired, but whites were. Specifically, when Humphrey sought to be rehired, he was told Jeff Wyler did not rehire people who had left his dealership. This was untrue, as whites were rehired regularly. Humphrey felt that the management at Jeff Wyler never "gave a damn" about the poor treatment of blacks. (Plaintiff's Appendix, Exhibit B)

Another black man who had a short tenure as a salesman at Jeff Wyler was Byron Scott. Late in 1997 or 1998, Jerry Bittner took a customer who had established a contact with Scott and referred the customer to a white salesman. As a result, Scott did not receive any commission

from the deal. Scott expressed his anger about the incident to Hearns. Hearns explained that that is the way things are done at Jeff Wyler. (Hearns Aff. at ¶ 145)

In 1998 Valerie (last name unknown at this time), was the first black-female salesperson hired since Hearns was at Jeff Wyler. Like Hearns, she was treated more harshly than similarly situated white employees. After about 2 months of training, Jerry Bittner gave her an ultimatum in which he required her to write-up so many deals and talk to so many people. If she failed to meet these requirements she would be fired. These quotas were higher than those given to similarly situated white salespersons. (Hearns Aff. at ¶¶ 146-149)

Valerie was upset that Bittner singled her out for harsher requirement. When she confided in Hearns, Hearns spoke-out and protested on her behalf. Bittner refused to change his mind, and Valerie ended up resigning in distress. Hearns reported the incident to Cathy Roberts in Wyler's Human Resources Department, but no remedial action was ever taken. (Hearns Aff. at ¶¶ 150-153)

**T.    The Tragic Aftermath.**

As a direct result of the discriminatory conduct Hearns endured at Jeff Wyler he suffered extreme emotional distress and mental suffering. He is disabled and no longer able to work. His treating psychiatrist, Robert M. Simms, M.D., indicates that Hearns "suffers from ongoing symptoms of Major Depression Disorder." "The precipitating stress has been the experience of great humiliation, harassment, discrimination and abuse while employed as a car salesman." Dr. Simms has diagnosed Hearns with Major Depression and Post Traumatic Stress Disorder as a result of his abuse at Jeff Wyler. (Hearns Depo. at Exhibit Q)

## II.    ARGUMENT

**A.    Standard for granting for summary judgment.**

19

Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *Ivy Street Corporation v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). See also, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Ivy Street Corporation* at 1435.

**B.    Defendants are not entitled to summary judgment on Hearns' claims of racial discrimination (Counts 1 and 2) as Hearns has established a prima facie case of racial discrimination and a hostile work environment.**

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] religion." 42 U.S.C. § 2000e-2(a)(1).

**1.    Prima facie case of a hostile work environment.**

In order to establish a prima facie case of a hostile work environment based on race, a plaintiff must establish that: (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

"The elements and burden of proof are the same, regardless of the discrimination context in which the claim arises." *Crawford v. Medina Gen'l* Hospital, 96 F.3d 830, 834 (6th Cir. 1996); *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405 (6th Cir. 1999).

      a.    **First, Second and Third Elements**: Defendants have conceded that Hearns has satisfied the first three elements of a prima facie case, and therefore these are not at issue.

The first three elements of Hearns' prima facie case are not in dispute. Defendants admit that Hearns is a member of a protected class . . . he is African-American. Defendants do not dispute that Hearns was subjected to unwelcome harassment, and that harassment was based on race. (Defendants' Motion for Summary Judgment at p. 6) Only the final two elements are at issue.

      b.    **Fourth Element**: Due to the repeated instances of racial harassment at Jeff Wyler, Hearns was subjected to an intimidating, hostile, and offensive work environment.

The fourth element of a prima facie case requires the plaintiff to demonstrate that the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment. See *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. *Harris v. Forklift, Sys.*, 510 U.S. 17, 114 S.Ct. 367 (1993).

Defendants argue that since Hearns was the top salesman during 1997, 1998, and 1999, the harassment he suffered did not unreasonably interfere with his work performance, thereby negating this fourth element. Defendants' argument wholly lacks merit.

Do the defendants truly believe that so long as an African-American employee is ostensibly successful, he can be subjected to the most virulent kind of racist behavior with no legal recourse? Of course this is not the law.

The United States Supreme Court has stated that the language of Title VII is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of

employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment. *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707, 98 S.Ct. 1370 (1978).

In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, the Supreme Court stated that Title VII prohibits sexual misconduct in the workplace, whether or not it is directly linked to the grant or denial of economic *quid pro quo*, where such conduct has the purpose or effect of unreasonably interfering with an individual's work performance **or creating an intimidating, hostile, or offensive work environment.** [emphasis added]

Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. Courts have uniformly agreed that a plaintiff may establish a violation of Title VII by proving that discrimination has created a hostile or abusive work environment. *Id.*

> [The] phrase "terms and conditions or privileges of employment" in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination. . . . One can easily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers. . .

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, quoting *Rogers v. EEOC*, 454 F.2d 235 (5th Cir. 1971). See also *Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933 (6th Cir. 2000). An employee's psychological as well as economic fringes are statutorily entitled to protection from employer abuse. *Firefighters Institute for Racial Equality v. St, Louis*, 549 F.2d 506, 549 F.2d 506 (1977).

Defendants' claim that Hearns has not shown a hostile or offensive work environment is ludicrous   The lynched dolls, the "nigga" notes, the stolen property, the slashed tires, the racial slurs, the public humiliation by members of Jeff Wyler management, the false claims of theft,

seeing other black employees and customers treated unjustly, and the numerous instances of disparate treatment between white and black employees, all created a hostile, offensive, and intimidating environment for Hearns.

### 1) Even a little racism is not okay.

The defendants have conceded that Hearns was subjected to racial harassment. But they hope for dismissal of Hearns' complaint because the harassment was not severe enough to interfere with his work. The defendants are mistaken. First, Title VII tolerates no racial discrimination, subtle or otherwise. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817 (1973). Second, Hearns is now disabled as a direct result of the unrelenting and vicious discrimination he experienced while employed at Jeff Wyler. (Hearns Depo. at Exh. P, Q).  It is disingenuous to suggest that this racial harassment did not interfere with his work.

### 2) The word "Nigger" is more than an offensive utterance.

In this case, the repeated use of the word "nigger," especially by management, is troublesome. Perhaps defendants may argue that it is simply a word and that it does not prove discrimination.   But it is more than a simple word. Case law makes it clear that the use of the word "nigger," even taken in isolation, is more than a "mere offensive utterance." E.g., *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) "No word in the English language is as odious or loaded with as terrible a history." *Dasco v. The Grafton School, Inc.,* 181 F. Supp.2d 485, 493 (D. Md. 2002)  "That the word 'nigger' is not a slur is not debatable." *NLRB v. Foundry Div. of Alcon Indus., Inc.,* 260 F.3d 631, 635 (6th Cir. 2001)

Further, to put pictures of gorillas and monkeys with the word "Nigga," written on them, on a black man's desk cannot be interpreted as anything but what it is .  .  . a hate-filled, hostile

and bigoted message, intended to intimidate the recipient. It is not a prank or simple joke. Wallach's references to blacks as "them people," "heathens," and "leeches," are no different. Such conduct cannot be tolerated in modern America.

The fact that some of the racist comments were made to other Wyler employees, and not to Hearns, is not relevant to this Court's analysis. The Sixth Circuit Court of Appeals has emphasized that offensive comments need not be directed at the plaintiff in order to constitute a violation of Title VII. See, *Jackson v. Quanex Corp.,*191 F.3d 647, 660 (6th Cir.1999). Indeed, "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment." *Id.* at 660. See also, *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999); *Schwabb v. Town of Avalon*, 118 F.3d 106, 111-12 (2nd Cir. 1997); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2nd Cir. 1997).

### 3) The presence of racial epithets is evidence that a racial animus was behind other offensive action taken against Hearns.

The fact that the management and other employees at Jeff Wyler used racial slurs casts serious doubt on the legitimacy of all the punitive action that Wyler took against Hearns. Even though some punitive action may have been ostensibly race-neutral, the racist mind-set that existed at Jeff Wyler permits an alternative inference.

In *Bowen v. Missouri Dept. of Social Servs.,* 311 F.3d 878 (8th Cir. 2002), an African-American supervisor called the plaintiff a "white bitch." Although the supervisor's several other hostile acts were not overtly racial, the court held that "(b)ecause the epithets carried clear racial overtones, they permit an inference that the racial animus motivated not only (the supervisor's) overtly discriminatory conduct but all of her offensive conduct towards (the plaintiff)." *Bowen* at 884.

In this case, it is reasonable to infer that some of the acts that were not overtly racial (i.e. slashing car tires, stealing property, making false allegations, etc.) were also motivated by a racist animus.  Additionally, it is important to point out that unlawful discrimination need not be the only reason for an adverse employment action, to violate Title VII, but rather need only be an essential component of an employer's mixed motive. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240-241, 120 S.Ct.  2097 (2000)

### 4)    A "lynched" black doll is more than a prank.

Defendants may want to believe that the act of lynching a black doll is only a prank that did not create an offensive or hostile work environment. But they would be gravely wrong. This behavior is so despicable that it would be insincere to suggest it did not interfere with Hearns' work environment.

In *Dickerson v. State of New Jersy Dept. of Human Serv.,* 767 F. Supp. 605, 616 (D.N.J. 1991), the court held that the mere mention of the KKK invokes a long and violent history sufficient to detrimentally affect any reasonable person of the same race as the plaintiff. Similarly, the act of "lynching," (often associated with the KKK) also invokes the same long and violent history. A lynched black doll in the workplace would have a profoundly negative impact on any reasonable African-American.

The determination of whether certain conduct is hostile or offensive cannot be made by the perpetrator. Conduct that may be only distasteful to whites, may very well be extremely offensive and intimidating to a black person.

"The omnipresence of race-based attitudes and experiences in the lives of black Americans [may cause] even nonviolent events to be interpreted as degrading, threatening, and offensive." *Harris v. International Paper Co.*, 765 F. Sup. 1509, 1516 (D. Me. 1991) *vacated in*

*part on other grounds*, 765 F. Supp. 1529 (D. Me. 1991) (noting that "instances of racial violence or threatened violence which might appear to white observers as mere 'pranks' are, to black observers, evidence of threatening, pervasive attitudes").

### 4)  The treatment of other black employees is compelling evidence of racial discrimination at Jeff Wyler.

The mistreatment of other black employees at Jeff Wyler provides strong evidence of racial discrimination.  Should defendants argue that the treatment of other blacks at Jeff Wyler is not relevant to the issues before this Court, they would be mistaken.

In *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999), our Court of Appeals remanded a discrimination case for a new trial, when the trial court refused to admit evidence of other racial incidents that were not directed against plaintiff. The Sixth Circuit stated: "We find such a myopic view of harassment unacceptable, particularly in light of the directive in *Harris* that courts are to consider 'all of the circumstances' in determining whether a hostile work environment exists. Under the 'totality of the circumstances' approach, a "district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." *Jackson* at 660.  See also, *Williams v. General Motors Corp*. 187 F.3d 553, 562-63 (6th Cir. 1999) (evidence of sexually related remarks, foul language, and mean and inequitable treatment by co-workers gave rise to a jury question, because impact of successive incidents may accumulate to create hostile work environment).

> In rejecting the narrow approach adopted by the district court in this case, we recently observed that when a lower court disaggregates the claims of a plaintiff alleging hostile work environment, contrary to the "totality of circumstances" approach, it robs the incidents of their cumulative effect, and "of course, when the complaints are broken into their theoretical component parts, each claim is more easily dismissed." *Jackson* at 660.

The Sixth Circuit appropriately reasoned that "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis

must not concentrate on individual incidents, but on the overall scenario." *Jackson* at 660 quoting *Andrew v. City of Philadelphia*, 895 F.2d 1469, 1484 (3rd Cir. 1990). See also, *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998 (1998).

When this Court views the entire performance of what took place at Jeff Wyler, including how other black employees were treated, a very disturbing and sinister story is revealed.

Tony Sanders, a black man, was denied the same demo benefits that white manager received, resulting in him not accepting a management job. (Hearns Aff. at ¶¶ 92-102)

Tony Grove, a black man, was fired for telling Margaret Ingram he could kiss her for getting a difficult deal done. But when Ingram, who was white, made inappropriate sexual comments and physical contact with Hearns, she was not fired. (Hearns Aff. at ¶¶ 56-66) White employees, Brett May and Jake Ashendorf, committed absolutely deplorable acts of sexual harassment and they were not terminated. (George Aff. at ¶ 4)

Byron Scott, a black man, had an established customer taken away from him and given to a white salesman. Scott lost his commission from the sale. (Hearns Aff. at ¶ 145)

Ramone Humphrey, a black man, received racist messages; similar to the ones Hearns received. He was forced to return work early after suffering an injury or he would be fired. He was treated coldly at a company picnic. (Humphrey's Statement, Exhibit B)

Valerie, a black woman, was given more difficult standards to meet than were white employees. She was singled out and given an impossible ultimatum. She left her employment at Jeff Wyler in distress over the way she had been treated. (Hearns Aff. at ¶¶ 146-153)

Clearly, black employees were treated in an intimidating, offensive, and hostile manner. Whites were given preferential and favored treatment. This goes well beyond simply creating a

27

jury question of whether there was racial discrimination at Jeff Wyler .   .   . it pretty much proves it.

### 5)  Jeff Wyler's vile treatment of black customers is strong evidence of a racist animus.

Looking at the totality of the circumstances in this case, the treatment of black customers also paints a bleak picture for Jeff Wyler. Should defendants argue that the treatment of customers is not relevant, they will again fail.

In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399 (1986), the landmark case establishing a cause of action under Title VII work workplace harassment, the Court approved a Title VII harassment claim brought by a Hispanic plaintiff who alleged that her employer created a hostile work environment for employees by discriminating against Hispanic clientele. 477 U.S. at 65-66.  "As *Meritor* demonstrates, an employer may create a hostile work environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir.1999)

In the case at bar, there is ample evidence that black customers at Wyler were also mistreated. (Hearns Depo. at pp. 83-84) White customers were moved ahead of them in the finance line. Black customers who protested apparent racist conduct at Wyler were hosed down with water. Even a black professional football player perceived discriminatory treatment at the dealership.  Wallach felt that Wyler's black customers were "heathens," and "leeches." In the presence of Teresa George, Wallach stated he was "tired of [Hearns] bringing those nigger customers in here." (George Aff. at ¶ 2)  Certainly, Hearns seeing fellow black citizens hosed down, treated unfairly, moved to the back of the line, and called disparaging names by those in charge of Jeff Wyler would unquestionably result in an offensive and hostile work environment.

Additionally, the fact that Wyler's employees and managers were racially hostile towards its own customers makes it just as likely that the abusiveness leveled towards Hearns was motivated by race.

In sum, Hearns was subjected to overtly racist behavior.  He was also the victim of numerous incidents which may not have been overtly racist, but from which an inference of racism could be made by the trier-of-fact. Looking at the totality of circumstances, we see that other black employees were also abused and treated unjustly at Jeff Wyler.  And finally, black customers were also mistreated and subjected to discriminatory practices at Wyler. Hearns has more than adequately shown that he was subjected to a hostile and offensive work environment.

**7)    Hearns' psychological well-being is devastated.**

There is absolutely no merit to defendants' claim that since Hearns was a top producer for three years, he failed to establish that he was subjected to a hostile and offensive work environment. Hearns' psychiatrist has found that the years of abuse, harassment, and mistreatment at Jeff Wyler has caused Hearns serious problems with major depression. As a result of this constant abuse and humiliation, Hearns is disabled and unable to work at this time.

This is the work environment that was prophesized by the United States Supreme Court when it stated:

> One can easily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers. . .   *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, quoting *Rogers v. EEOC*, 454 F.2d 235 (5th Cir. 1971).

This is precisely what Jeff Wyler did to Hearns. Hearns is entitled to his day in court. Defendants' motion for summary judgment should be denied.

**c.    <u>Fifth Element</u>: Employer liability has been demonstrated by Hearns.**

Defendants next argue that Hearns has not met the fifth element of a prima facie case, that being employer liability. (Defendants Motion for Summary Judgment at p. 5)  This claim is also without merit.

### 1)    "Co-Worker" versus "Supervisor" Liability.

The distinction between co-worker and supervisor liability becomes crucial. Employer liability for co-worker harassment is based directly on the employer's conduct.  *Pierce v. Commonwealth Life Ins. Co*., 40 F.3d 796, 804 (6th Cir. 1994). An employer is only liable if it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* at 804.

In contrast, employer liability for supervisor harassment is markedly different from that of co-worker discrimination. In supervisor harassment cases the employer liability is vicarious. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275 (1998); *Pierce v. Commonwealth Life Insur. Co.,* 40 F.3d 796, 803 (1994).  Under such circumstances, the plaintiff does not have to prove that the employer knew or should have known of the conduct: "This liability is direct; the employer cannot find shelter in the claim that it neither had notice of or approved the unlawful conduct." *Vinson*, 477 U.S. at 71, 106 U.S. at 2408. See also, *Karibian v. Columbia University*, 14 F.3d 773, 780 (2nd Cir. 1994) (employer absolutely liable if supervisor uses actual or apparent authority to further harassment). When the alleged hostile work environment is created by a manager, the employer would be automatically liable. *Clark v. UPS*, 400 F.3d 431, 348 (6th Cir. 2005)

In the case at bar, Jeffrey Wyler, Steve Baxla, Tony Gomez, Chuck Adomitis, Margaret Ingram, and Bill Adkins were all in supervisory and management positions at Jeff Wyler when

they abused Hearns. By being supervisors they were all the alter-ego of Jeff Wyler Fairfield, Inc. Therefore, the liability of Jeff Wyler Fairfield, Inc., for their conduct is direct and vicarious.

Hearns admits that Duncan Riddle did not have supervisory powers over him, and would probably be considered a co-worker. However, this fact does not shield Jeff Wyler Fairfield, Inc. from liability. Jeff Wyler Fairfield, Inc. clearly knew or should have known of the harassment that Hearns suffered at his hands. Hearns made numerous and continual complaints about the manner in which he was mistreated. His complaints were directed to the proper management authority. Jeff Wyler Fairfield, Inc., through its agents, knew or should have known, what was going on. Lower-level employees such as Teresa George, Barbara Chaney, Ramone Humphrey, all knew what was going on, Jeff Wyler cannot try to shield itself from liability because its managers chose to try to sweep everything under the rug.

> 2) **Wyler failed to implement prompt and appropriate corrective action.**

In both instances involving "co-workers" and "supervisors," Jeff Wyler Fairfield, Inc. failed to implement prompt and appropriate corrective action. See *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994).

For instance, when Hearns' received the racist notes with the words "nigga" written on them, they were reported to management. But no action was taken. Hearns also reported instances of Duncan Riddle, Tony Gomez, Jerry Bittner and Chuck Adomitis using racial slurs to Kathy Roberts of Human Resources prior to September of 1999, but no action was taken.

The "investigation" that the defendants make reference to in its motion was not initiated until Hearns got his attorney involved by means of a letter sent to Jeff Wyler on September 30, 1999. (Hearns Depo., Exhibits G, H, K) At no time prior to legal counsel getting involved did Wyler take any meaningful action to correct the problem.

In *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir.1999), the Court of Appeals found that when the employer took no action to discover the perpetrators who had created racist grafitti, "these were not actions reasonably calculated to end racially offensive conduct." *Id.* at 664. Also, in *Jackson*, when supervisor blew-off of the complaints and did little to stop it, the Sixth Circuit found that such inaction "manifests indifference or unreasonableness." *Id.*

That is exactly what took place in this case. Hearns made continual complaints to management about the offensive conduct that was happening at Jeff Wyler. But the managers simply ignored his complaints, and expressed an attitude of "indifference and unreasonableness." Not only did management ignore Hearns' complaints, but with an arrogant and cavalier attitude, they labeled him a troublemaker, and threatened him if he continued to complain.

No action of any sort was taken until after Hearns got his lawyer involved. It is distressing that it took over three years of abuse and the involvement of any attorney to get Wyler to even look into it. After the years of abuse and callous indifference to Hearns' pleas for help, the defendants cannot now try to hide behind the law.

Additionally, Hearns made it clear that he did not agree with most of the conclusions that were reached in the "investigation," and that an adequate and proper investigation was never done. (Hearns Depo. at p. 131)

In *Jackson*, the Sixth Circuit stated that "if a remedy 'is ineffectual, liability will attach, an employer's actions will not necessarily shield it from liability if harassment continues." *Id.* citing *Fuller v, City of Oakland*, 47 F.3d 1522 at 1529.

Even after the "investigation" conducted by Wyler, Wyler's staff continued to engage in discriminatory conduct. It was **after** the "investigation" that Hearns was suspended in October of 2001 on the claim that he missed a sales meeting, despite having a doctor's excuse. It was **after**

the "investigation" that Tony Gomez falsely accused Hearns of stealing a white salesperson's customer. It was **after** this "investigation" that Hearns was reprimanded when he was the victim of sexually inappropriate comments made by a white manager.  It was **after** the "investigation" that a manager took away a deal from Hearns and gave it to a white salesperson.  It was **after** the "investigation" that Hearns was punished for not being able to make his sales quota due to medical problems.  It was **after** the "investigation" that management implemented the punitive policy of not allowing Hearns to speak to an established customer if he saw them at the dealership.    Additional thefts took place **after** the "investigation." It was **after** the "investigation" that Hearns was run-off the dealership when he arrived to retrieve some personal items. The problem with "flipped deals," continued even **after** the "investigation. (Hearns Depo. at p. 108)  The "investigation" conducted by Wyler resulted in no meaningful changes at the dealership. Hearns was still treated differently than were white employees.  Jeff Wyler was well aware of the racist attitude that saturated the dealership, but he chose to do nothing meaningful to correct the problem. As such, he and his company are liable.

**2.      Similar cases clearly demonstrate that summary judgment in not appropriate.**

In *Allen v. Michigan Dept. of Corrections*, 165 F.3d 405 (6th Cir. 1999), the court of appeals reversed the granting of summary judgment on a racial harassment claim.  In *Allen,* the plaintiff had been subjected to racial slurs and other hostile conduct.   Allen, an African-American, was called "lazy like the rest of his people." A supervisor told Allen, "I'm writing your black ass up," and that "niggers can't be trusted." Allen also received a note signed by the "KKK." The note made reference to lynching and there was a drawing of a stick figure with a noose around its neck.  The *Allen* Court concluded that as a result of this conduct, Allen was in fact subjected to a hostile work environment.

The *Allen* case is very similar to the case at bar. Like Allen, Hearns received racist notes, was subjected to depictions of the lynching of a black person, and was the victim of racial slurs and racist stereotypes. Like Allen, Hearns's case is not appropriate for summary judgment.

In *Johnson v. UPS, Inc.*, 2004 U.S. App. LEXIS 23795(6th Cir.), our Court of Appeals reversed the trial court's granting of a motion for summary judgment on the issue of federal and state racial harassment charges. The factors that our Court of Appeals found to be persuasive in concluding that the plaintiff was in fact subjected to a hostile work environment are remarkably similar to the factors in this case.

In *Johnson*, the supervisor told the plaintiff "he's tired of African-American's complaining." *Id.* at 7. In Hearns' case, his managers made it clear they were tired of him making complaints and warned him to stop.

In *Johnson*, the plaintiff was accused of "stealing, falsifying records, and stealing company time." *Id.* In Hearns' case, he was accused of removing company records that belonged to another, and of stealing customers.

In *Johnson*, when the plaintiff requested the employer produce records so he could disprove the stealing time allegation, the request was not granted. In Hearns' case, when he asked Tony Gomez to identify the witnesses to the allegation of theft, so he could disprove the accusation, Gomez refused to identify the supposed witnesses.

In *Johnson*, John Althoff, a white employee was only suspended for one day after he made racial comments and struck co-worker, Eddie Thomas, Jr., an Africa-American. The court noted that under defendant's zero tolerance policy, Althoff could have been terminated. In Hearns' case, Tony Grove, a black salesman was terminated under Wyler's zero tolerance sexual harassment policy. But Margaret Ingram, who was white, was not terminated for sexually

inappropriate conduct. White employees Brett May and Jake Ashendorf were not terminated for vile acts of sexual harassment. Further, Hearns was reprimanded even though he was the victim of improper sexual comments by Margaret Ingram.

In *Johnson,* Thomas, the black employee who was assaulted by Althoff, was later terminated for falsifying his employment application. It is interesting to note that defendants in this case, in trying to defend its racist conduct, point out that Hearns' falsified his employment application. (Def's Motion for Summary Judgement at p. 1)

In *Johnson*, the plaintiff's supervisors attempted to punish him for wearing his prescription sunglasses inside. *Id.* at 7. Hearns was punished for going to his doctor and being placed on restricted duty by his doctors.

In *Johnson*, the court found that the use of the word "nigger" constituted severe racial conduct. It further held that since the word was allegedly uttered by a manager, that greatly increased its severity. *Id.* at 8. In the case at bar, the word "nigger" was used frequently by managers.

The *Johnson* Court noted that making racially derogatory comments by a supervisor in the context of responding to plaintiff's complaint, is significant. *Id.* at 8. In this case, Wallach made racially derogatory comments to Hearns during the process of Hearns complaining of racial discrimination.

Because of these stated factors, the *Johnson* Court concluded that:

> Viewing the evidence in the light most favorable to Plaintiff as the nonmovant the conditions of employment were altered, by an environment of management hostility towards African-Americans. Plaintiffs subjective feelings of hurt and loss of trust were objectively reasonable.

*Id.* at 8.

The companion case to *Johnson* that involved a plaintiff named Goodwin is also telling. The Sixth Circuit concluded that Goodwin was subjected to a hostile work environment. Goodwin was "screamed at" by his supervisors to roll down his shirtsleeves, even though white employees were permitted to have their sleeves rolled up. *Johnson* at 9. In Hearns' case, the record is replete with instances in which Hearns and other black employees were not permitted to do things that white employees did. Hearns was also screamed at and humiliated on several occasions by Jeff Wyler managers.

When Goodwin was off with an injury, his manager called him at home told him he was going to have a slim Christmas, while at the same time taking up a collection for white injured workers. *Id.* at 10. In Hearns' case, he was harassed and humiliated by his managers while off work with an injury.

In Goodwin, the black employees were supervised more restrictively at daily employee meetings, while white employees were permitted to "cut-up" at the meeting. *Id.* at 10. With Hearns, the record is again full of instances in which black employees were given much less latitude than white employees, and subjected to more stringent discipline then were whites.

Taking these factors into consideration, the Sixth Circuit also found summary judgment to be improper in Goodwin's case. *Id.* at 11. For very similar reasons, summary judgment is not appropriate in Hearns' case.

**3.    Disparate Treatment Permits Inference of Racial Discrimination.**

An inference of racial discrimination can be established by showing that similarly situated non-protected employees were treated more favorably. *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241 (6th Cir. 1995). The record in this case is full of instances of disparate treatment between the races.

Hearns was suspended when he switched his schedule. White employees changed schedules all the time and were not punished. White employees were given the benefit of flipped deals, Hearns was not. Whites employees on leave were permitted at the dealership, Hearns was not. Whites employees were regularly permitted to use company cars, Hearns was not.

White salespersons were permitted to approach customers at the dealership and receive the benefit of split deals, Hearns was not. Hearns was often yelled at and demeaned in the presence of other employees and customers, white employees were not. White salespersons that were given sales award were publicly acknowledged with much fanfare. Hearns' awards were simply left on his desk. White employees were permitted to park in the customer service area when this department was closed. Hearns was not. White salespersons were permitted to complete deals in the finance office. Hearns was not.

Hearns has established more than an inference of discrimination. Hearns has proven discrimination of the most virulent kind.

**4.    The individual defendants are not entitled to summary judgment.**

    **a.    Jeff Wyler Fairfield, Inc. and Jeff Wyler, the individual, have already admitted to being Hearns' "Employer" and are not subject to dismissal.**

The individual defendants argue that they are entitled to summary judgment, as they were not Hearns' "employer." And that someone who does not qualify as an "employer," may not be held liable under Title VII.

"Employer" is defined to mean "a person engaged in an industry affecting commerce who has fifteen or more employees . . . **and any agents of such person**. 42 U.S.C. § 2000e(b). [emphasis added]

37

In its Answer, Defendant Jeff Wyler Fairfield, Inc. admitted to being Hearns' "employer." (See Complaint at ¶ 3; Answer at ¶ 2)   Jeff Wyler, the individual, is also seeking summary judgment on this issue. His claim is without merit. Jeff Wyler, the individual, has already admitted to being Hearns' "employer" in its answer to the complaint. (See Complaint at ¶ 3; Answer at ¶ 2)  With such an admission, Jeff Wyler cannot now claim he was not Hearns' "employer" and seek to be dismissed from the lawsuit. Jeff Wyler Fairfield, Inc. and Jeff Wyler, are according to the pleadings, Hearns' "employer," and are not entitled to summary judgment.

Further, Jeffrey Wyler is the owner and namesake of the dealership and the ultimate arbiter of authority at the dealership. Jeff Wyler is responsible for the supervision of **all** employees at Jeff Wyler Fairfield, Inc.  (See Complaint at ¶ 5; Answer ¶ 1)  In addition to his admissions the facts demonstrate he is Hearns' "employer" as defined in 42 U.S.C. § 2000e(b).

### b.     Defendants Steve Baxla, Tony Gomez, Chuck Adomitis, Bill Adkins, and Margaret Ingram are all "agents" of Jeff Wyler, and are therefore, his "employer" as defined in the Code.

The definition of "employer" includes "any agents" of such person. See 42 U.S.C. § 2000e(b).  "Agent" is not defined by Title VII but has been interpreted as "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing, and conditions of employment." *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803 (6th Cir. 1994).

Defendants Steve Baxla, Tony Gomez, Chuck Adomitis, Margaret Ingram, and Bill Adkins all qualify as "agents" of Jeff Wyler Fairfield, Inc.  These individuals all held supervisory positions at Jeff Wyler Fairfield, Inc.  Steven Baxla is the director of Human Resouces and has direct involvement in the hiring and firing of employees. Baxla was also responsible for the investigation of the complaints that were made by Hearns. (See Complaint at

¶ 6; Answer at ¶ 1; Hearns Aff. at ¶¶ 154-155) Defendant Gomez was the General Manager of Jeff Wyler Fairfield, Inc. and had direct supervisory control over Hearns. (See Complaint at ¶ 7, Answer at ¶ 1; Hearns at ¶ 156) Defendants Chuck Adomitis, Margaret Ingram, and Bill Adkins were all managers and supervisors at the dealership and had direct control over Mr. Hearns. They all had supervisory powers with the power to control the conditions at Jeff Wyler. (Hearns Aff. at ¶ 157)  All these named defendants possessed the authority to terminate employees, transfer employees, and had a say in who was hired.  (Hearns Aff. at ¶ 158)

Therefore, Steve Baxla, Tony Gomez, Chuck Adomitis, Margaret Ingram, and Bill Adkins, all qualify as agents of Jeff Wyler Fairfield, Inc., and are all properly named defendants pursuant to 42 U.S.C. § 2000e(b).

### c.    Defendant Duncan Riddle may not be an agent of Jeff Wyler.

Hearns concedes that Defendant Duncan Riddle was not a supervisor or manager, and may not qualify as an agent of Jeff Wyler Fairfield, Inc. under Title VII.  Hearns also recognizes that *Wathen v. General Electric Co.,* 115 F.3d 400, 405 (6th Cir. 1997) stands for the proposition that an individual who does not otherwise meet the definition of an "employer" may not be held personally liable under Title VII.

### C.    Defendants are not entitled to summary judgment on Hearns' claim of retaliation (Contained within Counts 1 & 2) as Hearns has established a prima facie case of retaliation.

Retaliation against a worker because they have opposed unlawful, employment discrimination is expressly prohibited by Title VII.  To establish a prima facie case of retaliation, Hearns must show that: (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment

action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Wrenn v.* Gould, 808 F.2d 493, 500 (6th Cir. 1987)

In the case at bar, there were numerous occasions when Hearns was retaliated against as a result of his complaints of racism. For instance, when Hearns complained about Wallach giving preferential treatment to white customers, Hearns was engaged in protected activity. Gomez refused to investigate the matter and took no action. When Wallach referred to black people as "them people," "heathens," and "leeches," Hearns complained. Again, certainly activity protected by Title VII.   Wallach then threatened Hearns and claimed he was going to "get him." Gomez took no corrective action and in fact defended Wallach, who were fellow managers. Approximately, a month later, Hearns was suspended for supposedly not coming to work when scheduled.  But Hearns had in fact changed schedules with another employee, which white salesman did frequently with no adverse consequences.

In this instance, Hearns has made a prima facie showing of retaliation. First, Hearns' complaints about the manner in which blacks were treated, and the disparaging names they were called, is conduct protected by Title VII. Second, the conduct was known to defendants. Hearns complained directly to Gomez. Wallach was aware of the complaints because he threatened to "get him." Third, the defendants took adverse action against Hearns as he was suspended shortly afterwards. And fourth, there was a causal connection between the protected conduct and the adverse action.  When Hearns' continued to complain, Wallach threatened to get Hearns, and sure enough, Hearns is suspended for doing something that white salesman did all the time. When Hearns was suspended, Gomez told him that he did not like him.

Chuck Adomitis threatened Hearns with termination if he continued to complain about racism. Even when Hearns did nothing wrong, he received reprimands. When Hearns

complained about the way Tony Sanders was treated in regards to the discriminatory use of demos, Hearns was warned by Adomitis to mind his own business.

The management was absolutely brazen in its retaliation, even after Hearns had involved legal counsel.   After numerous letters had been sent to Wyler by Hearns' legal counsel complaining of discrimination and expressing concerns of retaliation against Hearns, Gomez instituted a punitive policy that applied only to Hearns.  Hearns was prohibited from approaching and speaking to any of his customers when they came into the dealership. This policy prevented Hearns from benefiting from split commissions.  This adverse policy was not applied to any whites, only Hearns.

When Hearns was on leave, they did not allow him to come to the dealership. But white employees were welcomed. Gomez was so sick of Hearns' complaints that he tried to fabricate a false reason for punishing Hearns by claiming he stole somebody else's customer.  This was a complete and absurd fabrication. When a third-party protested the dealership because of racist conduct, it was Hearns who was threatened with loss of pay if he did not get her off the property.

Hearns has clearly demonstrated sufficient evidence, for a trier-of-fact to determine that he suffered retaliation as a result of his numerous complaints of illegal discrimination that was taking place at Jeff Wyler. When someone is "lynched" in effigy, it is hard to deny that racial animus is behind any adverse action.

**D.    Defendants are entitled to summary judgment on any section 1983 claim.**

Hearns concedes that there is no apparent state action in this case, and that he does not wish to make a claim to pursuant to 42 U.S.C. § 1983. To the extent that the reference in ¶ 41 of the Hearns' complaint to § 1983 asserts a claim, defendants are entitled to have such claim dismissed.

41

E.    **Defendants are not entitled to summary judgment on Hearns' Americans with Disabilities Act ("ADA") claim (Count 3) because it grew out of his racial discrimination claim.**

Defendants argue that they are entitled to summary judgment on Hearns' ADA claim because Hearns did not explicitly state an ADA claim in his charge of discrimination filed with the Ohio Civil Rights Commission ("OCRC").

Hearns admits that the charge of discrimination he filed with OCRC and EEOC does not contain a specific claim for a violation of the ADA. But, he "need not attach the correct legal conclusion," "conform to legal technicalities," or use "the exact wording which might be required in a judicial pleading." *Jones v. Sumer Retirement Village,* 209 F.3d 851 (6th Cir. 2000); *Davis v. Sodhexo*, 157 F.3d 460 (6th Cir. 1998).

Rather, "the **claim must grow out of the investigation** or the facts alleged in the charge must be sufficiently related to the claim such that those facts would prompt an investigation of the claim." [emphasis added] *Id.*

In the case at bar, the ADA claim grew out Hearns' claim of racial discrimination. Hearns filed his claim of discrimination on November 30, 2001. He was not terminated until May 1, 2002. The reason given for the Hearns' termination was he was "unable to return to work after six months of disability." But since Hearns was not terminated for being disabled until after the charge has been filed, Hearns could not have known to include that in his charge. Because his ADA claim "grew out of" his race discrimination claim, defendants are not entitled to dismissal.

Further, when a claimant completes a charge of discrimination without an attorney, courts are required to give a broad reading of the charge before the EEOC. See, *Aug v. Proctor & Gamble Co.,*932 F.2d 540 (6th Cir. 1991)  Hearns did not have counsel present when he completed his administrative charge for the OCRC. (Hearns Aff. at ¶ 159)

**F.    Defendants are not entitled to summary judgment on Hearns's state slaim of Disability Discrimination. (Count 4)**

Contrary to the claims of defendants, Hearns has established a prima facie case of disability discrimination under Ohio Revised Code § 4112.02.  Defendants only challenge the first element of Hearns' § 4112.02 claim .  .  . whether Hearns proved he was disabled. While Hearns admitted his back injury was not disabling, he was disabled at a result of his severe depression. Hearns had no depression, or mental illness of any kind prior to the abuse he received at Jeff Wyler. (Hearns Depo. at pp. 124-125; Exhibits P, Q)

**G.    Defendants may be entitled to summary judgment on Hearns' claim of retaliation for filing a worker's compensation claim. (Count 5)**

Hearns does not contest the factual claims or statement of law that is set forth by the defendants on this issue.

**III.    Conclusion**

For all the foregoing reasons, defendants' motion for summary judgment on Counts 1, 2, 3, and 4, should be denied.

43

Respectfully Submitted,

/s/ Bryan R. Perkins

Bryan R. Perkins (0061871)
Trial Counsel for Plaintiff
119 E. Court Street
Suite 314
Cincinnati, Ohio 45202
(513) 632-5335
(513) 721-5824 Fax
BPerkins@courtstreeteast.com

## CERTIFICATE OF SERVICE

I certify that on June 28th, 2005, I electronically filed the foregoing document with the

clerk of court using the CM/ECF system which will send notification of such filing to Donald W.

White, Esq., 237 Main Street, Batavia, Ohio 45103.

/s/ Bryan R. Perkins

Bryan R. Perkins (0061871)
Attorney at Law

44