FILED
JAMES BONINI
CLERK

05 JUN 28 PM 11: 28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES HEARNS, JR., | : | Case No.        1:02cv00496 |
| | : | |
| Plaintiff, | : | (Judge Bertelsman) |
| | : | |
| vs. | : | |
| | : | |
| JEFF WYLER FAIRFIELD, *et. al.,* | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

# APPENDIX TO
## PLAINTIFF JAMES HEARNS RESPONSE
## IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

Bryan R. Perkins (0061871)
119 East Court Street
Suite 314
Cincinnati, Ohio 45202
(513) 632-5335
(513) 721-5824 Fax
Bperkins@CourtStreetEast.com

*Trial Counsel for Plaintiff,*
*James Hearns, Jr.*

Donald W. White, Esq.
Elizabeth Mason, Esq.
Nichols, Speidel & Nichols
237 Main Street
Batavia, Ohio 45103

*Trial Counsel for Defendants,*
*Jeff Wyler Fairfield, Inc., et. al.*

## TABLE OF CONTENTS

<u>Exhibit</u>

Affidavit of James R. Hearns, Jr.……………………………………………………………A

Statement of Ramone Humhrey……………………………………………………...…B

Letter from Unified Sports Management, Inc.……………………………………………C

Affidavit of Teresa George.……………………………………………………………D

Affidavit of Barbara Chaney.……………………………………………………………...E

*Johnson v. UPS*, 2004 U.S. App. LEXIS 23795 (6th Cir.)(unreported)……………………….………F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| JAMES HEARNS, JR., | : | Case No.    1:02cv00496 |
|  | : |  |
| Plaintiff, | : | (Judge Bertelsman) |
|  | : |  |
| vs. | : |  |
|  | : |  |
| JEFF WYLER FAIRFIELD, et. al., | : | **AFFIDAVIT OF JAMES R.** |
|  | : | **HEARNS, JR.** |
| Defendants. | : |  |
|  | : |  |

STATE OF OHIO                    )
                                 )SS
COUNTY OF  *Hamilton*            )

Now comes Affiant, and after being duly sworn and cautioned, states as follows:

1.  I am James R. Hearns, Jr., the plaintiff in the above captioned case.
2.  I am an African-American.
3.  I am an honorably discharged veteran of the United States Army.
4.  I began as a car salesman with Jeff Wyler in 1996.
5.  I was terminated as a car salesman with Jeff Wyler in 2002.
6.  I noticed a racist attitude among the staff at Jeff Wyler's dealership, immediately upon starting my job.
7.  On at least 6 occasions between the years of 1996 and 1997, I found racist notes left on my desk at the dealership. For instance, I would find ads that had pictures of monkeys and gorillas with the word "nigga" across it.
8.  On at least 2 occasions, I found a black doll hanging from a window blind cord. The cord had been wrapped around the dolls neck as if it had been lynched.
9.  I found these incidents to be extremely upsetting, and I was offended by this blatantly racist conduct.
10. My white co-workers thought these incidents were funny.
11. I reported these incidents to Mark Kattran, the general manager. I also reported these incidents to Mark Ashworth, the new car manager. No action was taken as a result of my complaints. No investigation was made to determine who had committed these acts.
12. Mark Kattran's responded to me that "I should not worry about it."

13.  I was offended and disturbed that Wyler management took no action over these incident.

14.  Around the same time, another African-American salesman, Ramone Humphrey, experienced the same offensive activities. A photograph of a black man with a rope around his neck was left on his desk. He also reported the incident to Mr. Ashworth, the new car manager, but not corrective action was taken.

15.  Sometime around 1998 I began lodging complaints against the finance manager, Cary Wallach, because of racist conduct. Wallach was known to be a racist.

16.  I noticed that when I had black customers waiting in the financing line to have their deal processed, Wallach would often move white customers, who had not been waiting as long, ahead of my black customers.

17.  This conduct was unfair and I was disturbed to see my black customers forced to wait longer than white customers who had arrived in line later than my black customers. I never saw Wallach move a black customer ahead of a white customer.

18.  I complained of Wallach's discriminatory conduct to Tony Gomez, the general manager.

19.  Wallach and Gomez were fellow managers and good friends. Gomez always supported Wallach, no matter what Wallach did. I perceived it to be a "buddy system."

20.  When I complained to Gomez, Gomez refused to even look into the matter. No corrective action of any type was taken against Wallach.

21.  Sometime around 1999, Wallach made racist statements about my black customers. He referred to them as "them people," "heathens," and "leeches."

22.  I was deeply offended and disturbed to have my customers were referred to by such names by a member of Wyler management.

23.  I reported these statements to Tony Gomez, the general manager. Initially, he took no action and ignored by complaints.

24.  I insisted that Gomez take disciplinary action Wallach. I stayed in Gomez's office and refused to leave until some action be taken. Eventually Gomez told Wallach to go home for ½ day.

25.  I believe Gomez only sent Wallach home to try to pacify me. But I found that only sending him home for ½ day for making racist comments about black customers was in itself offensive. No meaningful corrective action was taken by Gomez.

26.  Further, Gomez became upset with me for pushing my complaint against Wallach.

27.  Shortly afterwards, Wallach confronted me in the parking lot, and he was angry at me because of my complaint against him. He threatened me and said he was going to "get" me.

28.  I also reported this threat to Gomez. Gomez laughed about the incident. No corrective action was taken against Wallach. And Wallach took no

2

further action with this matter. He continued to be aggravated at me for pursuing the matter.

29. About a month after being threatened by Gomez's friend, Wallach, I was suspended for supposedly not reporting to work on a scheduled work-day.

30. I had switched scheduled days off with fellow salesman Bob Ernst. And I was not supposed to work on the day at issue.

31. Even though I explained this to Gomez, Gomez indicated he was still going to suspend me.

32. When Gomez suspended me, he stated "I don't like you and you don't like me."

33. When I explained that I had three customers to deliver vehicle to on the day I was to be suspended, Gomez replied "too bad."

34. I was hurt and offended that I was suspended for this reason. White salesman regularly switched schedules with no disciplinary action being taken against them.

35. My trust of Wyler management was broken. I believed I was really being punished because I had complained about Wallach's racist comments.

36. Sometime around 1998-1999, a co-salesman, Duncan Riddle made racist comments.

37. I did not get along well with Duncan Riddle. Riddle never tried to hide the fact that he was a racist and disliked black people.

38. Since I knew Riddle to be a racist, I asked that he just stay away from me.

39. Riddle stated "you black people are all alike."

40. Riddle made this comment in the middle of the dealership showroom within the earshot of fellow workers and customers.

41. I was embarrassed and humiliated by Riddle's comment.

42. I reported these comments to Jerry Bittner, a new cars sales manager. Bittner ignored my complaints, and took no corrective or disciplinary action against Riddle.

43. Fellow Wyler employee, Carla Combs, had witnessed Riddle make a racist comment about. She gave a statement to Jerry Bittner about the statement.

44. Wyler management became hostile toward Combs for supporting me.

45. The next thing I knew, Combs was fired and charged with the crime of theft for allegedly stealing money from Wyler.

46. I believe this was retaliation for her providing support to me.

47. The charges against Combs were dismissed.

48. Sometime around October of 1999, Chuck Adomitis, my manager at Jeff Wyler became angry at me because of a race related complaint that was lodged by one of my customers.

49. Mr. Ozzie Davis III, President of Unified Sports Management, sent a letter to Jeff Wyler in which he complained about the racially discriminatory manner in which one of his clients, Akili Smith, was treated by Cary Wallach.

50. The letter urged Jeff Wyler to make efforts to end the racist conduct that was taking place at his dealership.

51.  Adomitis was upset about the letter. He would always get mad and angry if anybody said anything against racist conduct or racist attitudes that were taking place at Jeff Wyler.

52.  Adomitis told me I was a troublemaker and threatened to terminate me if I continued to make complaints about racial discrimination.

53.  Around this same time, I was taken into Tony Gomez, the general manager's, office and warned that I would be punished if my complaints of racial discrimination caused any disruption in the sales force.

54.  Sometime in early 2001, Margaret Ingram, the special finance manager, contacted one of my established customers that I was currently working a deal with. Ingram asked my customer to finish the deal with a white-female salesperson.

55.  The customer was concerned and upset over the deal had been taken away from me.

56.  While the deal was being completed, Margaret Ingram made many inappropriate comments in front of the customers. The comments included calling me "sweet heart," "my baby," and "honey." Ingram also physically rubbed my shoulders, and making comments about my body.

57.  Ingrams's conduct and comments were humiliating and embarrassing.

58.  The customer asked me if I was romantically involved with Ingram. I was not.

59.  I have never known a deal to be taken away from a white salesman by a manager.

60.  I never saw a white salesman treated with such disrespect in the presence of customers.

61.  The incident with Ingram was reported to Wyler management, but no action was taken against Ingram.

62.  Strangely, I ended-up being reprimanded over the incident, even though I have been the object of sexually inappropriate conduct and comments by Margaret Ingram.

63.  Sometime about two weeks or so after the incident with Ingram, another incident took place between Margaret Ingram and another black salesman, Tony Grove.

64.  Ingram was successful in getting a difficult customer of Grove's financing. Grove commented that he was so happy he could kiss Ingram. The matter was reported, and Tony Gomez terminated Grove.

65.  Gomez claimed he had to terminate Grove because Jeff Wyler had a "zero tolerance" policy regarding sexual harassment.

66.  When I first started at Wyler in 1996, I noticed the discriminatory manner in which "flipped" deals were given out.

67.  A "flipped" deal is a deal that is given to salesman from the manager to write-up. The deal does not originate with the saleperson's efforts, but rather from the managers referral.

68.  The salesperson is still paid a commission for a "flipped" deal.

69.  I was not given flipped deals. Flipped deals were only given to white salesman.

70. Because of the discriminatory manner in which they deals were given out I objected to management, but not changes were made. I periodically objected to these deals during my period of employment at Wyler. My complaints were made to managers Chuck Adomitis and Jerry Bittner, but no corrective action was taken. They told me that I was a troublemaker and ignored by complaints.

71. "Flipped" deals also still counted toward the salesman's required monthly quota, and of course financially benefited the salesman who received the flipped deal.

72. Not only were other black employees abused and treated with disrespect at Jeff Wyler, but black customers were all ill-treated.

73. Sometime around 1997, I sold a Cadillac to a black customer by the name of Kim. She complained to me about being treated badly by the service department.

74. I referred her complaint to the manager, Chuck Adomitis for resolution.

75. After she spoke with Chuck Adomitis, she was even more upset and frustrated over how she was treated by Adomitis. She told me that she felt that Adomitis was racist.

76. She was so upset over the manner in which she was treated by the service department and Adomitis, that picketed the dealership.

77. When Adomitis discovered Kim and her two small children outside the dealership, with Kim picketing, he became extremely upset.

78. Adomitis confronted Kim and cursed at her. He ordered her to leave the dealership.

79. When Kim ignored Adomitis, he came back into the dealership and yelled at me in the presence of other salespeople and customers. Adomitis told me that I had better go tell Kim to leave the dealership. He warned me that if she refused to leave, I would be in trouble and it would come out of my paycheck. This was humiliating and embarrassing to me.

80. I advised Adomitis that I had no control over another person. And quite frankly, I agreed with Kim's assessment of the racism that was rampant at Jeff Wyler.

81. Myself, and Ramone Humphrey overheard Adomitis tell Jerry Bittner to have a lot tech go outside and present to wash some cars with a water hose, and then to spray Kim and her children with water.

82. A lot tech went outside and sprayed Kim and her children with water. Kim left the dealership.

83. I was offended and irate over the incident, and I could not believe that a member of Wyler management had ordered a black customer to be sprayed with water. I was angry and deeply embarrassed over this incident.

84. I confronted Adomitis and told him he never would have done that to a white customer. Adomitis again blew-off my complaint.

85. I have never seen a white customer treated in such a disrespectful and abusive manner. I believe the incident was motivated by racism.

86.    I was injured on the job in 1999, and my doctor ordered me to be on restricted duty of working no more than 6 hours a day.

87.    In November of 1999, I reprimanded for selling only 6 cars when the required quota was 8 per month.

88.    I responded that I was not permitted, or able, to work a full-time schedule, which made it much more difficult to meet the quota. That made no difference to management. I was warned I would be terminated if I did not meet my quotas by the end of December.

89.    After I filed for Workers Compensation as a result of my injury, I was constantly insulted and harassed by Bill Adkins for not being able to a full 8-12 hour day. This harassment continued even though I was under a doctor's care and following the doctor's orders.

90.    Chuck Adomitis also harassed Ramone Humphrey, a black salesman, when he was injured on the job. Humphrey shared with me that he actually returned to work before his doctor would permit him because he knew Adomitis would terminate him if he did not.

91.    White employees who were off-work due to injuries were not harassed in this manner.

92.    White employed at Jeff Wyler, I came to know an African-American by the name of Tony Sanders. Sanders applied for and received a position as a special finance manager at Jeff Wyler.

93.    Sanders was the first black person who was given a job at Jeff Wyler in management during the time time I was employed.

94.    At Jeff Wyler all managers are given demo vehicles for both personal and business use. This is also the standard in the profession.

95.    I observed that white managers were given their demo vehicles immediately upon becoming managers.

96.    When Sanders was offered the management job, manager Chuck Adomitis and Steve Kaiser told Sanders that he would have to wait 30 days before he would be given a demo vehicle.

97.    Sanders confided in me about the problem he was having with his demo vehicle being withheld.

98.    I was happy about the prospect of a black manager being hired, hoping that it would bring a positive change to the dealership and hopefully end some of the racism that was prevalent at the dealership.

99.    Unfortunately, such positive change would not happen.

100.    Sanders had moved here from out-of-town, and he needed to receive the demo immediately.

101.    Sanders insisted on getting a demo immediately, but Adomitis and Kaiser refused.

102.    Because of this, Sanders declined the job at Jeff Wyler and sought employment elsewhere.

103.    I protested to Adomitis and Kaiser about the unfair manner in which Sanders was treated, and reminded them that all white managers were given their demos immediately.

104. Adomitis and Kaiser were agitated about me even raising this issue, and warned me that I needed to mind my own business.

105. I believe that Sanders was treated differently because of his race.

106. I was hurt and disappointed that Sanders was mistreated and did not accept the job for that reason. I was angry at Wyler management for their action. Had they treated Sanders in the same manner that they treat white managers he would have not declined employment, and maybe there would have been some positive changes at Jeff. Wyler.

107. The ability to use company cars by salesman also varied according to the race of the salesman. It was routinely accepted that a salesman at Jeff Wyler could use a company car if his personal vehicle broke down, if he needed to report to corporate headquarters, or if the salesman used the the car for promotional reasons.

108. When my personal vehicle broke down, Chuck Adomitis prohibited me from using a company car. When I was required to report to corporate headquarters, I was not permitted to use a company car.

109. White salesman were permitted to use company cars for any of the above stated reasons. John Heekin, a white salesman, was permitted to use a company car for several consecutive days, including for personal use such as going to AA meetings.

110. In October of 2001, general manager, Tony Gomez advised me of an informal policy that only applied to me. Gomez told me that if I if saw an established customer come into the dealership I could not approach them, or speak them, unless they specifically asked for me.

111. This had an adverse impact of me as it limited my ability to benefit from "split deals." "Split deals" are when two salesman split a commission when one salesman initiates the contact and works with a customer for a time, and another salesman completes or closes the deal. By not allowing to benefit from split deals in this manner I was adversely impacted financially.

112. This unofficial punitive policy was not applied to any other white employees; it was only applied to me. White salesman were freely permitted to approach and speak with customers when they came into the dealership, and benefit from split deals.

113. I believe that my race and my complaints of racism were the reasons why this punitive policy was applied to me.

114. Around October of 2001, while I was on leave, I went to the Jeff Wyler dealership to retrieve personal property from my desk.

115. Rob Long, was told by Tony Gomez to tell me that I had to leave the dealership. I was told that it was the policy of Jeff Wyler that if an employee was on leave they were not permitted to be on company property.

116. I had never heard of this policy before. If it existed it was applied in a discriminatory manner. As some examples, Peggy Arguella, a white salesman was on leave for 7-9 months and she would frequently come to the dealership to visit 2-3 times a month while she was on leave.

7

117. Also, Amy Jones, a white employee, who was on short-term disability leave, would periodically come to the dealership without objection. This adverse policy was applied only to me.

118. Around October of 2001, I was called into a meeting the general manager, Tony Gomez and John McGuire. Gomez leveled serious and degrading allegations against me.

119. Gomez claimed that I stole another salesman customer and that I would be punished. I questioned him about the basis of the allegation, because it was absolutely untrue. Gomez claimed that he had three witnesses who had seen me go into another salesman's office, remove the paperwork, and call the customer. I protested because I had never done such a thing. I was humiliated by this incident.

120. I asked him who the witnesses were and Gomez refused to identify them or give any specifics of the allegations. Fortunately, for me Paul Conrad from the service department confirmed that he had referred the customer at issue to me, and that it was in fact my customer.

121. This allegation was completely fabricated and untrue. The customer had in fact been mine all along. I believe this claim was a pretense to try to punish me because of my race and because of my numerous complaints of racism.

122. In October of 2001, Jeff Wyler's management required that I document any time that I had to go to a doctor's appointment. White employees were not required to do this. I would be harassed and threatened by management if I ever failed to produce documentation.

123. On a Wednesday in October, I provided written verification to the manager, Bill Adkins, and Rob Long, the assistant manager, that I had a doctor's appointment the following Saturday.

124. On the same Saturday, a sales meeting was scheduled, but I was not aware of the meeting at the time I scheduled my doctor's appointment.

125. I was not even aware of the meeting until the Friday before the meeting, when Rob Long called me and advised me of the meeting. I advised Long that I would be unable to attend the meeting because I had to go to the doctor. Long said "okay."

126. ~~The following Monday~~, I brought the written verification from my doctor showing that I in fact I was at my doctor's appointment on Saturday.

127. I was given a three-day suspension for missing the sales meeting. I became extremely depressed over the incident. I was punished for going to a required doctor's appointment. Adkins and Long knew before that I had a doctor's appointment, and I verified afterwards that I had been at the doctors. But I was still punished. I felt that management was out to get me because of my race and because of the many complaints that I had made about the unjust treatment of black employees, other black customers, and myself.

128. I had never known a white person to be punished for missing work as a result of a doctor's appointment.

8

129. I had lost all sense of security with my employment. I felt that no matter what I did, they were going to get rid of me one way or the other.

130. There were many other instances of unfair and disparate treatment that took place at Jeff Wyler. For instance, when I first started in 1996, Jeff Dickson, a white salesman, had won Salesman of the Month (for selling the most cars). When Dickson was there was a big celebration and a lot of fan-fare, along with a special presentation of his award.

131. Anytime that I won the sales award, it was simply left on my desk with no acknowledgment of any kind.

132. Also when I won Salesman of the Year, I did not timely receive my bonus check. When I asked Chuck Adomitis about not receiving my check, he "went off" on me, yelled and screamed at me in the presence of another employee, telling me "you'll get it when you get it." He warned me not to say anything more about it.

133. I was deeply embarrassed and humiliated over being yelled and screamed at for simply asking about why my check had been delayed. I had never seen white employees treated in such a disrespectful manner. Also, I was not aware of anyone else's check being unduly delayed.

134. Sometime in 1997, my sport coat and money were stolen. After I called the police, my sport coat reappeared. Also there was an instance when the tires on my person vehicle were slashed at the Jeff Wyler dealership.

135. Sometime in 1998, a check was stolen out of my desk at the dealership. Several white salespeople found the theft to be amusing.

136. Around December of 1998, I was supposed to receive a fast-track bonus check. The check was delayed for unexplained reasons.

137. Sometime around October of 1999, Chuck Adomitis accused me of being armed with a firearm, even though I was only carrying a cell phone. All the white salesman carried cell phones, but were never accused of being armed with a handgun.

138. I was publicly reprimanded and humiliated by Cary Wallach when I had gone in to his office to retrieve copies of my past deals. White salesman commonly did this and they were not humiliated or reprimanded for the same conduct.

139. I reported this humiliating incident to Tony Gomez, but he simply ignored me and took no action to correct or investigate the matter. No action was taken against Wallach.

140. In October of 1999, I parked my personal vehicle in the customer service area of the Jeff Wyler dealership. It was a Saturday and the service department was closed. Employees commonly parked there when the service department was closed.

141. Chuck Adomitis told me to move my vehicle, which I did. At the same time, two white employees, Larry Hall and Cathy the receptionist, had also parked in the same area. Adomitis did not require the white employees to move their vehicles. This is just another instance of there being rules for me, and a different more lenient set of rules for white employees. I found this fact to be disturbing and upsetting.

9

142. Sometime around 1999, my Rolodex and paperwork from all my deals were stolen from my office.

143. When Jeff Wyler finally launched an investigation late in 1999, Chuck Adomitis retaliated against me by disallowing reimbursement of advertising costs. I am aware that white salespersons continued to receive reimbursement.

144. Cary Wallach would constantly yell at me and demean me in front of other employees and customers when I tried to complete deals in the finance office. When white salesman did this, nothing adverse was said to them.

145. Late in 1997 or 1998, a black salesman by the name of Byron Scott was working at Jeff Wyler. Bittner took a customer who had established a contact with and was working with Scott on a deal and gave the deal to a white salesman.  Scott did not receive any commission from the deal. Scott expressed his anger to me over the incident, and  I had to explain to him that that is the way things are done at Jeff Wyler.

146. Around 1998, Valerie LNU, was the first black-female salesperson hired by Jeff Wyler since I began employment at Jeff Wyler.

147. Valerie was treated more harshly than were white salespersons.

148. After about 2 months of training, Jerry Bittner gave her an ultimatum. He required her to speak to a certain number of customers and write-up a certain number of deals. These requirements were more stringent than those required of similarly situated white salesperson. If she failed to meet these strict requirements she would be terminated.

149. Valerie confided in me about the problem. She was deeply troubled and depressed about the harsh treatment. She was distressed that she had been singled out for this ultimatum.

150. I was angered when I heard that Valerie had been singled out for stricter treatment.

151. I saw this as just another incident of discrimination at Jeff Wyler. So I protested on her behalf, but Bittner refused to change his decision.

152. Valerie was distraught and upset that she resigned in distress.

153. I reported this incident to Cathy Roberts in Wyler's Human Resources Department, but no remedial action was taken. No investigation was made and no changes were made.

154. At times relevant to my lawsuit, Steven Baxla was the director of Human Resources. Baxla has direct involvement in the hiring and firing of employees at Jeff Wyler Fairfield, Inc.

155. Baxla was responsible for the investigation of the complaints that were made by Hearns.

156. At times relevant to my lawsuit, Tony Gomez was the general manager at Jeff Wyler Fairfield. He had direct supervisory control and power over me. He was also above all the lower managers who supervised by work at Jeff Wyler.

157. At times relevant to my lawsuit, Chuck Adomitis, Margaret Ingram, and Bill Adkins were all managers and supervisors at Jeff Wyler who had

10

supervisory power over me. They could implement discipline, and terminate Wyler employees.

158.   All the above named defendants, as supervisors and managers at Jeff Wyler, had daily contact with me. They possessed the authority to terminate employees, discipline employees, transfer employees, had a say in who was hired, and had the ability to control the working conditions at Jeff Wyler.

159.   When I completed my charge of discrimination at the OCRC, I did not have legal counsel present.

160.   Further affiant sayeth naught.


_James R. Hearns, Jr._
James R. Hearns, Jr.


Sworn to and subscribed to in my presence on this 27th day of June, 2005, by James R. Hearns, Jr.

_Tabatha L. Anderson_
Notary Public

**TABATHA L. ANDERSON**
**NOTARY PUBLIC, STATE OF OHIO**
**MY COMMISSION EXPIRES 07-22-07**

11

# RENDIGS, FRY, KIELY & DENNIS, L.L.P.

ATTORNEYS AT LAW

900 FOURTH & VINE TOWER

FIVE WEST FOURTH STREET

CINCINNATI, OHIO 45202-3688

PHONE (513) 381-9200

TELECOPIER (513) 381-9206

———

WRITER'S DIRECT DIAL NUMBER

513/381-9278

fgora@rendigs.com

November 5, 1999

Mr. Ramone Humphrey
320 St. Clair Street
Lawrenceburg, IN 47025

**RE:   Jeff Wyler Oldsmobile Cadillac**

Dear Mr. Humphrey:

Please review your enclosed statement for correctness. I would appreciate it if you would make any notations or corrections on the document, sign it and return it to me in the enclosed, self-addressed stamped envelope at your earliest convenience.

Thanks for your consideration.

Sincerely,

**RENDIGS, FRY, KIELY & DENNIS, L.L.P.**

Felix J. Gora

FJG:ics
Encls.

161552.1
11/5/99

## STATEMENT OF RAMONE HUMPHREY

**I have been advised by Felix Gora, investigator hired by Jeff Wyler Oldsmobile Cadillac Nissan, that the purpose of this interview with me and this statement is to investigate whether discrimination occurred at Wyler Oldsmobile Cadillac Nissan. My statement is voluntary, and no threats or promises have been made to me to obtain my statement. I have been further advised that the employer may take appropriate action based upon the outcome of this investigation. I have been assured that no reprisals will be taken against me for my truthful cooperation. The investigator requested that I maintain the confidentiality of this statement and his interview with me.**

Mr. Humphrey was an employee of Wyler from April 8, 1996 through approximately October, 1996. He was a salesperson in the new and used car department. His boss was Mike Katrin who was the General Manager. For approximately the last three months, Chuck Adonitis was the General Manager.

Other salespeople included Bill Flynn, James Hearns, Tim Timmers and Jack Dickson. Mr. Humphrey also recalls that Mark Ashworth was the Sales Manager who was fired.

Mr. Humphrey described James Hearns as a proud black man who really intimidated Chuck Adonitis.

Mr. Humphrey recalled that James Hearns had won Salesman of the Month for seven months in a row. He recalled that James Hearns' plaque was just placed on his desk. However, the following month, Jeff Dickson won Salesman of the Month and a big deal was made out of it. Mr. Humphrey described this event as appalling.

Mr. Humphrey also described an incident where someone left a picture of a black man with a rope around his neck on his desk. Mr. Humphrey put the word out and also told Mr. Ashworth about the incident.

Mr. Humphrey believed Mr. Ashworth simply shrugged it off and there was no meeting about the incident.

Mr. Humphrey described Bill Flynn as a well-known racist and he stayed away from Mr. Flynn. Mr. Flynn used the "n" word and Mr. Humphrey specifically heard him use such a word on the phone. ~~Mr. Humphrey~~ JAMES HEARN and Bill Flynn could not get along and Bill Flynn left sometime in 1996.

In Mr. Humphrey's estimation, the management "never gave a damn" as long as cars were sold. Mr. Humphrey also believed that the black salesmen always got the short end of the stick. For instance, he indicated he broke his ankle and was in a cast. Chuck Adonitis dogged him because he could not work and literally forced him to come back early.

Mr. Humphrey also "wondered about Chuck" as Mr. Humphrey tried to come back approximately six months ago to work at Wyler and was informed by Chuck that Wyler did not

rehire people if they had previously left the company. This contrasts with what Mr. Humphrey knows of white salespeople who have been rehired.

Mr. Humphrey heard Chuck Adonitis vehemently abusing James Hearns. It is Mr. Humphrey's opinion that Chuck Adonitis did not like James Hearns, although James Hearns outsold the other salespeople and was their best salesperson.

Mr. Humphrey believes Chuck Adonitis has now left the company and he believed that this would happen sooner or later. Mr. Humphrey also believes that Mr. Adonitis would never communicate with anybody who was black as Chuck Adonitis would always talk to Mr. Dickson but never to him.

Mr. Humphrey also became aware of the episode with Mr. Sanders. Tony Sanders applied for the special finance manager position and Mr. Sanders is black. The finance manager is supposed to get a demo in his position. It is Mr. Humphrey's belief that Mr. Sanders was not going to be offered a demo. This was a deal breaker even though every other manager had a demo.

Mr. Humphrey indicated that after he was dogged by Mr. Adonitis regarding his ankle injury and inability to work, he came to the conclusion that he would have to leave the employ of Wyler. He also pointed out an incident when he went to the Wyler company picnic and he and his family were the only blacks at the picnic. He won $500 and noted the only person who clapped was Jeff Wyler.

Mr. Humphrey noted that he does not see any black managers at the Route 4 dealerships.

Mr. Humphrey also noted that one of James Hearns' black customers was picketing. He recalls that the management asked James Hearns to get that person to stop picketing or if not, he would lose his job. Mr. Humphrey stated that the lady had a right to picket and he believes it was unfair to demand that James Hearns deal with the issue.

Mr. Humphrey indicated that he did not believe Mr. Katrin was prejudicial. However, Mr. Humphrey believes that Chuck Adonitis does have a problem, at the very least in his perception.

Mr. Humphrey noted that Mr. Katrin, as General Manager, would let Mr. Humphrey take a car and use it as a sales tool at sales booths. When Chuck Adonitis got there, Mr. Adonitis said "no" to him. However, Mr. Adonitis would allow other people to take cars out, such as Jeff Dickson. Mr. Humphrey also noted that his car broke down for two days and he does live in Lawrenceburg, Indiana. He asked to borrow a car and was informed that he could not. However, Mr. Humphrey believed that certain other people were allowed to do things and in his estimation, he did not feel good to be an employee there.

Lastly, Mr. Humphrey stated that Chuck Adonitis seemed to talk to black salesmen differently, "although Chuck did not seem to notice it".

I have read the foregoing three pages and they are true and correct, with any changes noted by my handwriting.

Ramone Humphrey

# UNIFIED SPORTS MANAGEMENT, INC.

September 30, 1999

Jeff Wyler
829 Eastgate South Dr.
Cincinnati, Ohio 45245

Dear Mr. Wyler:

I am writing this letter in support of Mr. James Hearns, a business associate, friend, and provider of quality services. Our firm often refers clients to Mr. Hearns for their automobile needs. In the Cincinnati community, Mr. Hearns is known as a man of commitment and desire to serve.

Recently, one of our clients (Akili Smith) purchased a lease at Jeff Wyler and when his mother called back to the dealership to discuss another purchase she was very unhappy with the tone of the conversation she had with Mr. Terry Wallach. Mr. Hearns has expressed to me that there has been a very bad problem at the dealership for at least three years with racism and that he has approached his supervisor and little was done to resolve the matter. It had seemed to subside, but Mr. Tony Gomez, General Sales Manager has bought up the racism, bias, and discrimination again.

Mr. Hearns has further explained to me the recent happenings at the dealership that led to his suspension. It is our contention that the suspension of Mr. Hearns was uncalled for and a retaliatory attack due to Mr. Hearns openly approaching the racist bias and behavior of Mr. Wallach. For an employee to tell Mr. Hearns not to send "them people" to him is outright racist and ought not be allowed.

We have suggested to Mr. Hearns that he go to the Baptist Ministers Conference, NAACP, and Urban League if these conditions persist. Mr. Hearns has explained to us that Mr. Adomitis has been very helpful in promoting Mr. Hearns in the community and assisting him reach his goals as far as sales are concerned. We hope that you handle these concerns with your organization as soon as possible.

Sincerely,

Ozie Davis III
President

Cc:  James Hearns

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES HEARNS, JR., | : | Case No.    1:02cv00496 |
| | : | |
| Plaintiff, | : | (Judge Bertelsman) |
| | : | |
| vs. | : | |
| | : | |
| JEFF WYLER FAIRFIELD, *et. al.,* | : | **AFFIDAVIT OF** |
| | : | **TERESA GEORGE** |
| Defendants. | : | |
| | : | |

STATE OF OHIO            )
                                        )SS
COUNTY OF HAMILTON   )

Now comes Affiant, and after being duly sworn and cautioned, states as follows:

1.    I am Teresa George, I am an employee at Jeff Wyler Fairfield, Inc. From
1999 until the end of 2001 or 2002, I was the administrative assistant to
Tony Gomez, the general manager of Jeff Wyler Fairfield, Inc. I have
personally witnessed instances of racism at the dealership, and I believe
that James Hearns was discriminated against because of his race.

2.    While James Hearns was still working at Jeff Wyler, I heard Cary Wallach
and Duncan Riddle, on several occasions refer to James Hearns as a
"nigger." Wallach and Riddle also, on several occasions, referred to
Hearns' black customers as "niggers." Cary Wallach stated the he was
"tired of him [Hearns] bringing those nigger customers in here."  One one
occasion I had brought in photographs from my vacation. The photographs

included pictures of a black friend who I had vacationed with. Once Duncan Riddle saw that a black person was in the photo, he handed them back saying he didn't want to look at those "nigger pictures."

3.    I am familiar with the incident in which James Hearns was sexually harassed by Margaret Ingram. I was contacted in person by Hearns' customers who were offended and uncomfortable by what they had seen. They told me they wanted to see the general manager because they were deeply offended about Ms. Ingram touching all over Mr. Hearns and making inappropriate sexual comments.. The incident was reported to Gomez, and Gomez punished Hearns, not Ingram.

4.    As administrative assistant to the general manager, I am aware that white employees who committed acts of sexual harassment were not fired, but simply transferred to other dealerships. For instance, Brett May and Jake Ashendorf were white employees originally from the Eastgate dealership. They were found to have committed sexual harassment because they insisted on showing a pornographic movie in the break room despite protests of women employees. The only punishment for this conduct was for May and Ashendorf to be transferred to the Fairfield dealership. Ashendorf was then found guilty of another instance of sexual harassment where he simulated "humping" another man in the behind. Ashendorf was still not fired, but was transferred to Forest Park (which was closed, and then he was transferred to the Colerain store).

5.    Futher affiant sayeth naught.


_Teresa K George_
Teresa George.


Sworn to and subscribed to in my presence on this $2\,7^{\underline{th}}$ day of June, 2005, by Teresa George.

_Tabatha L. Anderson_
Notary Public

TABATHA L. ANDERSON
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 07-22-07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JAMES HEARNS, JR.,                   :      Case No.      1:02cv00496
                                     :
            Plaintiff,               :      (Judge Bertelsman)
                                     :
vs.                                  :
                                     :
JEFF WYLER FAIRFIELD, et. al.,       :      **AFFIDAVIT OF**
                                     :      **BARBARA CHANEY**
            Defendants.              :
                                     :


STATE OF OHIO            )
                         )SS
COUNTY OF _Hamilton_     )


Now comes Affiant, and after being duly sworn and cautioned, states as follows:

1.      I am Barbara Chaney. I was employed at Jeff Wyler Fairfield, Inc. from

        the years of 19_98_ and 20_03_.

2.      On numerous occasions I heard Cary Wallach and Duncan Riddle refer to

        James Hearns as a "nigger."

3.      Sometime in 2001, Duncan Riddle referred to Hearns as "the nigger" and

        indicated he did not want to work with Hearns.

4.      James Hearns was treated unfairly and disrespected by the management at

        Jeff Wyler.  White salesman were treated much better and with a greater

        amount of respect, than was James Hearns.

5.      Racism and racist statements were commonplace at Jeff Wyler.

6.    Further affiant sayeth naught.


_Barbara L Chaney_
Barbara Chaney.


Sworn to and subscribed to in my presence on this ___27th___ day of June, 2005, by Barbara Chaney.

_Tabatha L Anderson_
Notary Public

TABATHA L. ANDERSON
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 07-22-07

LEXSEE

**JEFFREY JOHNSON and JOHN GOODWIN, Plaintiffs-Appellants, v. UNITED PARCEL SERVICE, INC., Defendant-Appellee.**

No. 03-5620

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2004 U.S. App. LEXIS 23795; 2004 FED App. 0079N (6th Cir.)

November 10, 2004, Filed

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Amended by Johnson v. UPS, 117 Fed. Appx. 444, 2004 U.S. App. LEXIS 27209 (6th Cir. Tenn., Dec. 21, 2004)

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE. 00-00310. Curtis L. Collier, U.S. District Judge.

**DISPOSITION:** Affirmed in part, reversed in part and remanded in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For JEFFREY JOHNSON, JOHN GOODWIN, Plaintiffs - Appellants: William H. Horton, Horton, Maddox & Anderson, Chattanooga, TN.

For UNITED PARCEL SERVICE, INC., Defendant - Appellee: Waverly D. Crenshaw, Jr., Brian A. Lapps, Jr., Jason D. Fisher, Waller, Lansden, Dortch & Davis, Nashville, TN.

For LOCAL 519 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFERS, WAREHOUSEMEN & HELPERS, Defendant - Appellee: Christopher J. Oldham, Gulley Oldham, PLLC, [*2] Knoxville, TN; Angela R. Morelock, Knoxville, TN.

**JUDGES:** BEFORE: CLAY and GILMAN, Circuit Judges; O'Malley, District Judge. * RONALD LEE GILMAN, concurring in part and dissenting in part.

* The Honorable Kathleen M. O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

**OPINIONBY:** CLAY

**OPINION:**

**CLAY, Circuit Judge.** Plaintiffs, Jeffrey Johnson and John Goodwin, appeal from the order entered by the United States District Court for the Eastern District of Tennessee, on March 26, 2003, granting judgment as a matter of law to Defendant United Parcel Service ("UPS"), so as to dismiss with prejudice Plaintiffs' claims in this action for employment discrimination on the basis of race, under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981 and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 et seq. For the reasons set forth below, we **AFFIRM** the district court's order as to the disparate treatment claims of both Plaintiffs, and we **REVERSE** the district court's order and **REMAND** for a new trial on Plaintiffs' racial harassment [*3] claims under federal and state law.

**BACKGROUND**

*Procedural History*



Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 25 of 36

Page 2

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

On September 15, 2000, Plaintiffs in the present appeal, Jeffrey Johnson and John Goodwin, as well Johnny L. Boyd, Eric Kelley, Ken Cameron, Donnie Ware, Eddie J. Thomas, Jr., and Gregory Owens, filed a complaint alleging violations of Title VII, 42 U.S.C. § 1981 and the Tennessee Human Rights Act. An amended complaint was filed on August 10, 2001.

On September 13, 2001, the claims of Johnny L. Boyd were dismissed with prejudice, by agreed stipulation. On January 14, 2002, a second amended complaint was filed. On February 26, 2002, a third amended complaint was filed; this was the final complaint filed, and it was filed by all the plaintiffs to the original complaint, except for Boyd. The third amended complaint charged Defendant UPS with violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* and violations of 42 U.S.C. § 1981 and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.,* as a result of racial discrimination against the plaintiffs, all of whom are African-American, [*4] in the form of disciplinary actions and the denial of promotion, as well as the existence of a hostile work environment on the basis of race; the complaint also charged retaliation.

In April, July, and August of 2002, a jury trial was conducted, lasting eleven days. Before the case reached the jury, Defendant filed a motion for judgment as a matter of law, pursuant to FED. R. CIV. P. 50. On August 6, 2002, arguments were heard on this motion, and a ruling was issued from the bench by the district court, dismissing with prejudice numerous claims, including all claims of Plaintiffs Johnson and Goodwin, the parties to the present appeal. On August 7, 2002, the trial continued with respect to Ware's retaliation claim and Cameron's hostile work environment claim.

On August 28 and 30, 2002, Plaintiffs Johnson and Goodwin appealed. On September 24, 2002, in an unpublished decision, the appeal of Plaintiff Johnson was dismissed by this Court for lack of appellate jurisdiction, on grounds that no ruling had yet been entered terminating all issues in the case as to all litigants and that no appealable order as to Johnson had been issued under FED. R. CIV. P. 54(b) (allowing a court to enter [*5] a final judgment as to one party in a multi-party action, before final judgments have been entered as to all parties in the action).

The trial concluded on November 4, 2002. n1 On March 26, 2003, a final order was entered, dismissing with prejudice the claims of Johnson and Goodwin.

n1 The jury found in favor of Ware on the retaliation claim, awarding a total of $ 125,000

(comprised of $ 45,133 in mental or emotional injury and $ 79,867 in back pay). The jury found in favor of Defendant on Cameron's hostile work environment claim.

On April 23, 2003, Plaintiffs filed a timely notice of appeal.

### Substantive Facts

Plaintiff Johnson was hired by Defendant, UPS, in 1984 as a package car driver and remains employed with Defendant in this capacity as of the time of the most recent filings in the case. Plaintiff Johnson sought but was denied promotions into management positions. Plaintiff Johnson filed an administrative complaint with the U.S. Equal Opportunity Commission ("EEOC"), in April of 2000, at which [*6] time Johnson also served as a union steward for the Teamsters.

Plaintiff Goodwin began work part-time with Defendant in 1988, began to work full-time as a package car driver in 1994, and remains employed with Defendant in this capacity as of the time of the most recent filings in the case. Plaintiff Goodwin filed an EEOC charge against Defendant in March of 2000.

Plaintiffs present an in-depth account of facts relating to their claims. However, because the factual allegations of the two Plaintiffs differ, and because each Plaintiff presents a separate set of factual allegations for the claims of disparate treatment and of hostile work environment, explaining all of the details together here could become confusing. Consequently, for the sake of clarity, factual details are provided in the sections analyzing the claims, below.

### DISCUSSION

Plaintiffs Johnson and Goodwin raise two issues. First, Plaintiffs argue that the district court erred in granting judgment as a matter of law to Defendant on their claims for disparate treatment on the basis of race. Secondly, Plaintiffs contend that the district court erred in granting judgment as a matter of law to Defendant on their claims [*7] for racially hostile work environment. We regard all claims as alleging discrimination under both Title VII and the Tennessee Human Rights Act, although hereafter we rely solely on federal law. n2

n2 On appeal, Plaintiff never argues that 42 U.S.C. § 1981, pertaining to the right to make and enforce contracts, was violated. Thus, this issue (stated in the complaint) is waived.

None of the parties expressly argues whether the appeal pertains only to the federal claims or

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 26 of 36

Page 3

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

also to the state claims. It appears to us that Plaintiffs appeal not only their federal claims but also their state law claims. The prohibitions on discrimination in the Tennessee Human Rights Act are generally coterminous with those under Title VII of the Civil Rights Act of 1964. The relevant language of the state statute is almost identical to Title VII, and is not different in any way that is material to the instant case. 42 U.S.C. § 2000e-2(a); Tenn. Code Ann. § 4-21-401(a). Although Tennessee courts are not bound to construe state law discrimination claims in a manner consistent with federal courts' interpretations cf Title VII, *see Carr v. Robertson County,* 29 S.W.3d 466, 474 (Tenn. 2000), Tennessee courts have often tried to preserve consistency between federal and state discrimination law. *E.g., Parker v. Warren County Util. Dist.,* 2 S.W.3d 170, 176 (Tenn. 1999) ("we hold that the stated purpose behind the enactment of our THRA will be best served by maintaining continuity between our state law and the federal law on the issue of imposing employer liability for supervisor sexual harassment. We, therefore, adopt the Supreme Court's recently articulated standard of vicarious liability in all supervisor sexual harassment cases."); *Spann v. Abraham,* 36 S.W.3d 452, 465, 465 n.7 (Tenn. Ct. App. 1999) (applying federal law regarding disparate treatment to state claims). At trial, the verdict form as to the claims of Cameron and Ware (both of whose claims were brought pursuant to both federal and state law) did not distinguish between federal and state harassment claims. Consequently, our discussion of Plaintiffs' claims pertains to both state and federal claims.

[*8]

We take the two issues in order, examining each Plaintiff's factual circumstances separately, under each issue.

This Court has stated:

> We review *de novo* a district court's decision to grant judgment as a matter of law under Rule 50(a). . . . Judgment as a matter of law on a specific issue is appropriate when, viewing the evidence in the light most favorable to the nonmovant, (1) "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue" or (2) the

nonmovant's position on that issue represents "a claim or defense that cannot under the controlling law be maintained." Fed. R. Civ. Proc. 50(a) . . . .

*Diamond v. Howd,* 288 F.3d 932, 935 (6th Cir. 2002) (citations omitted).

I.

Plaintiffs argue that the district court erred in granting judgment as a matter of law on their claims of disparate treatment on the basis of race.

**A. Legal Framework**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In a Title VII case, a plaintiff bears the ultimate [*9] burden of persuading the factfinder that the defendant intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000). Unlawful discrimination need not be the only reason for an adverse employment action, to violate Title VII, but rather need only be an essential component of an employer's mixed motive. n3 A plaintiff may carry the burden by introducing direct evidence which shows that in treating a plaintiff adversely the defendant was motivated by discriminatory intent, or by introducing circumstantial evidence that supports an inference of discrimination. *Logan v. Denny's, Inc.,* 259 F.3d 558, 566-67 (6th Cir. 2001).

> n3 *Price Waterhouse v. Hopkins,* 490 U.S. 228, 240-41, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989). In a mixed motive case, where direct evidence of discriminatory intent is produced, the burden shifts to the employer to show by a preponderance that the adverse employment action would have been taken even if the discriminatory motive had not existed. *Wexler v. White's Fine Furniture,* 317 F.3d 564, 571 (6th Cir. 2003) (describing *Price-Waterhouse*).

[*10]

Where, as here, plaintiffs' evidence is circumstantial, a disparate treatment claim proceeds through a three-step framework. First, a plaintiff bears the burden of making a *prima facie* showing by demonstrating that 1) she is a member of a protected class; 2) she was qualified for the job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) she was replaced by a person

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 27 of 36

Page 4

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

outside the protected class or was treated less favorably than a similarly situated individual outside her protected class. *Id.* at 567 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as later clarified by *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). The *prima facie* test is meant as a relatively light burden. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981) (a Title VII case, stating, "The burden of establishing a *prima facie* case of disparate treatment is not onerous.").

If plaintiffs carry that burden, then, in the second step in the framework, the [*11] defendant faces the burden to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves,* 530 U.S. at 142. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.' *St. Mary's Honor Center, supra,* at 509." *Id.* at 143.

If the defendant carries its burden, then, in the final stage in the process, plaintiffs may demonstrate to the factfinder that the defendant's proffered reason is a mere pretext for intentional discrimination. *Id.* at 142-43. The factfinder may consider the evidence and inferences from the plaintiff's *prima facie* case, along with other evidence. *Id.* at 143. In showing pretext, plaintiffs bear the burden of disproving the defendant's proffered reason by a preponderance of the evidence. *Id.* Methods of disproving the defendant's reason include demonstrating that the reason 1) had no basis in fact, 2) was not the actual reason, and 3) was insufficient to explain the defendant's action. *Logan,* 259 F.3d at 567. To make a showing of pretext, in addition to disproving the defendant's stated reason, the plaintiff must also show by a preponderance [*12] of the evidence that the true motivation for the adverse employment action included intentional discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993) ("a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason.") (emphasis in original). From an evidentiary standpoint, in some (but not all) cases, sufficient evidence of discriminatory intent may come solely from the *prima facie* case. *Reeves,* 530 U.S. at 147-48.

On appeal Defendant contests only the third *prima facie* element (an adverse employment action) and the fourth element (treatment less favorable than that accorded to a similarly situated individual outside of the protected class) of the disparate treatment claims of Plaintiffs Johnson and Goodwin.

**B. Johnson's claim**

Plaintiff Johnson argues that there were four adverse employment actions (any one of which would have been sufficient to satisfy the third element of the *prima facie* case). Plaintiff contends that a written reprimand was issued, threatening to terminate Johnson if he continued to engage [*13] in the practice of moving his name on the staffing board that assigned drivers to routes. Plaintiff also argues that there was discrimination in scheduling, in not allowing him to move his name on the staffing board; Plaintiff states, "Mr. Johnson . . . was denied the right to exercise his seniority under the contract n4 with respect to delivery routes, requiring him to take more difficult workloads and assignments." (Plaintiffs' Br. at 22.) Allegedly, drivers with less seniority than Plaintiff were allowed to switch their names (and thereby alter their assignments) on the staffing board. Plaintiff also alleges discrimination as a result of Defendant not promoting him, after he submitted multiple letters (pursuant to Defendant's promotion procedure requirements), requesting promotion to management. Finally, Plaintiff alleges discrimination in training, stating that Defendant "failed to train him on rural delivery areas when it had agreed to do [so] more than a year before." (Plaintiffs' Br. at 22-23.)

n4 The collective bargaining agreement specifies that "seniority will be considered when making work assignments." (J.A. at 599.)

[*14]

Examining each of these instances individually, none appear to satisfy both the third and fourth elements of the *prima facie* case. Regarding the written reprimand, Plaintiff concedes that no EEOC charge was filed within the statute of limitations. On this basis, Plaintiff admits that there is no adverse employment action here; at most, there is background evidence of discrimination that would be relevant to other charges of discrimination. *AMTRAK v. Morgan,* 536 U.S. 101, 113, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002).

Regarding scheduling, this does not appear to be an adverse employment action. Case law indicates that, absent changes in salary or the number of hours of work, scheduling matters would not normally classify as potential adverse employment actions. *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 885 (6th Cir. 1996) ("reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims. *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir. 1987)"); *see also White v. Burlington Northern & Santa Fe Ry.,* 364 F.3d 789, 800 (6th Cir. 2004) (en banc) ("we reaffirm the definition [*15] [of adverse employment action] that we have developed in cases such as *Kocsis* and its progeny.").

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

Regarding failure to promote, as stated in *Nguyen v. City of Cleveland:*

> [A] failure to promote is an adverse employment action. In order to establish a prima facie case of racial discrimination based upon a failure to promote, the plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion, (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied.

229 F.3d 559, 562-63 (6th Cir. 2000) (citations omitted). Hence, Plaintiff meets the third element of the *prima facie* case. But Plaintiff fails to allege that promotions were given to employees outside of the protected class-nor does Plaintiff point to any evidence suggesting such a conclusion. Consequently, Plaintiff fails to satisfy the fourth *prima facie* element for discriminatory failure to promote. Moreover, Plaintiff does not counter Defendant's assertion [*16] that this claim is time-barred.

Regarding training, the allegation that Plaintiff was not trained on rural deliveries does not meet the standard for adverse employment action that is described above, of "a materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Bowman v. Shawnee State Univ.,* 220 F.3d at 461. Nor does Plaintiff even allege that similarly-situated employees outside of the protected class were given the type of training on rural delivery routes in question (to satisfy the fourth *prima facie* element).

Overall, Plaintiff Johnson fails to make out a *prima facie* case for disparate treatment. For the only adverse employment action, failure to promote, Plaintiff failed to allege that the fourth *prima facie* element was met.

## C. Goodwin's claim

Plaintiff Goodwin alleges three adverse employment actions. First, Plaintiff alleges having been wrongfully suspended. The collective bargaining agreement authorizes supervisors to ride with drivers, on occasion, to monitor their productivity. According to the trial testimony of union business [*17] agent Wes Trotterchaud, the supervisor-monitored runs were directed disproportionately at black employees. Plaintiff states that supervisor Steve Burtnett rode with Plaintiff and established the rate at which Plaintiff could make deliveries. Although the collective bargaining agreement forbade supervisors from assisting the drivers during the rides-presumably because this would inflate the delivery rate to which drivers would later be held-Plaintiff asserts that Burtnett "actually helped deliver packages" during the ride. Later, Burtnett notified Plaintiff of Burtnett's intent to suspend Plaintiff for failing to meet the delivery rate established with Burtnett's help. Secondly, Plaintiff had filed grievances alleging that Burtnett supervised him too closely by engaging in an excessive number of supervised rides. Finally, Plaintiff alleges discriminatory failure to promote, in denying his application for a position in the feeder department, "which is the 18-wheeler department." (J.A. at 164).

Regarding the alleged suspension, this Court has held that an employee who was suspended and later, as a result of a union grievance procedure, was reinstated with full back pay had suffered an [*18] adverse employment action. *Burlington Northern,* 364 F.3d at 800-03; *but see id.* at 803 ("a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action.") (citing *Jackson v. City of Columbus,* 194 F.3d 737, 752 (6th Cir. 1999)). However, there is no evidence that Plaintiff was actually suspended. According to Plaintiff's trial testimony, Burtnett notified Plaintiff of his intent to suspend Plaintiff, but a union grievance procedure was required, before Plaintiff could be suspended. Plaintiff prevailed in this procedure and, consequently, was never suspended. Hence, there is no adverse employment action, here.

Regarding the alleged problem of close supervision, the allegation here does not meet the definition of an adverse employment action, as set forth above. Also, on the fourth *prima facie* element, Plaintiff failed to allege that similarly situated individuals outside of the protected class were supervised less closely. (J.A. at 173) (Plaintiff Goodwin, on cross-examination, admitted to not knowing how closely other employees were supervised).

Regarding failure [*19] to promote, the analysis is a bit more complicated. At issue is the fourth element of the *prima facie* case; as stated above, this element requires that other employees with similar qualifications outside of the protected class received promotions when the plaintiff's request was denied. In direct examination, Plaintiff recounted that a white driver, Ralph Kennedy, applied for the feeder department; Kennedy had a driving accident on his record, meaning that under established procedures he should have been ineligible for the promotion for one year. However, after a one-month disqualification, Kennedy was promoted. There is a

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 29 of 36

Page 6
2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

question as to whether or not Kennedy was similarly situated. Defendant refers to Kennedy as a "higher seniority driver." Plaintiff has not countered this. Thus, it is not clear that Plaintiff has presented sufficient evidence to meet the somewhat demanding standard for being "similarly situated." *E.g., Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992) (describing a demanding standard for being similarly situated). We need not decide whether Plaintiff has met the standard for similarly situated, because the claim fails otherwise. [*20]

Even if, *arguendo,* Plaintiff has met the *prima facie* burden for the failure to promote claim, Plaintiff fails to show pretext. It appears that Plaintiff's own direct testimony provides Defendant's legitimate, non-discriminatory reason for promoting Kennedy instead of Plaintiff. As Plaintiff admitted at trial, the manager was engaging in favoritism, because Kennedy's father got the manager his first job.

Any motivation that is not tied to the prohibited grounds will suffice to meet a defendant's burden to produce a legitimate, non-discriminatory reason for the adverse employment action. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981) ("The explanation provided [by a defendant] must be legally sufficient to justify a judgment for the defendant."). Hence, Defendant's reason ("favoritism") would be legitimate under Title VII. Plaintiff does not attempt to disprove this motive; consequently, Plaintiff fails to allege pretext regarding failure to promote, which is the only adverse employment action that Plaintiff has established.

There is not sufficient evidence to support a jury finding in favor of either Plaintiff, on a disparate treatment [*21] claim.

**II.**

Plaintiffs also argue that the district court erred in granting judgment as a matter of law on their claims of racial harassment.

**A. Legal Framework**

Under Title VII, a plaintiff may show unlawful discrimination by demonstrating the existence of a hostile work environment:

> In order to establish a prima facie case of hostile work environment based on either race or religion, [a plaintiff] must establish the following five elements:
>
> 1. He was a member of a protected class;

2. He was subjected to unwelcomed racial and/or religious harassment;

3. The harassment was based on race or religion;

4. The harassment had the effect of unreasonably interfering with Hafford's work performance by creating an intimidating, hostile, or offensive work environment; and

5. The existence of employer liability.

*Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999) (citation omitted); *accord Bowman v. Shawnee State Univ.,* 220 F.3d 456, 462-63 (6th Cir. 2000) (sexual harassment).

There is an affirmative defense-namely that in a harassment case an employer may avoid liability by showing that the employer [*22] had taken reasonable care to prevent and correct harassment and that the plaintiff failed to avail himself or herself of the employer's mechanisms for redressing harassment. *See EEOC v. Harbert-Yeargin, Inc.,* 266 F.3d 498, 510 (6th Cir. 2001).

Looking at certain of the elements more closely, under the fourth element: "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys.,* 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). Here, there is a subjective component: the plaintiff must regard the environment as abusive. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000). Also, to be actionable, harassment must be severe or pervasive, creating an objectively hostile work environment (for a reasonable person), thus altering the conditions of employment. *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998); *Bowman,* 220 F.3d at 463. Relevant considerations in determining whether conduct is actionable "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive [*23]    utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.,* 510 U.S. at 23; *Goldmeier v. Allstate Ins. Co.,* 337 F.3d 629, 635 (6th Cir. 2003) (quoting these factors from *Harris*).

Under the fifth element, employer liability is established if the harassment was by a supervisor; if the harassment was by co-workers, then there is employer liability if the employer had actual or constructive

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 30 of 36

Page 7

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

knowledge of the harassment. *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).

### B. Johnson's claim

Plaintiff Johnson presents trial testimony that is probative of harassment. Plaintiff testified that in July of 1999: "[supervisor] Steve Burtnett came up to me and told me that Jimmy Buquo was going to ride with me this day . . ., and he was gong to haul me around all day, and I was to listen with my ears and eyes wide open." (J.A. at 198-99). Plaintiff was upset by the term "haul." When Plaintiff spoke with Chatanooga division manager Gary Todd about this, Todd expressed some sympathy. However, regarding Plaintiff's plan to file a grievance based upon alleged racial discrimination, [*24] Todd "said he's tired of African Americans complaining." (J.A. at 201.)

Plaintiff's trial testimony described a July 20, 1999 grievance. A supervisor had "trained [Johnson] to sheet each package as a different stop." (J.A. at 212.) Yet, Plaintiff testified that when he began following this practice, another supervisor, Steve Burtnett, accused him of "stealing, falsifying records and stealing company time." (J.A. at 206.) These accusations provided grounds for termination on the spot. In fact, another African-American employee, John Boyd, had recently been fired for "stealing time," i.e., reporting working hours that exceeded the actual amount of time that the employee had worked, for instance, by taking a break longer than that permitted. To disprove the "stealing time" allegation, Plaintiff requested records relating to his training, but this request was not granted.

Around this time, Plaintiff spoke with union business agent Wes Trotterchaud about Plaintiff's grievances for racial discrimination. Trotterchaud stated that Defendant would not address the grievance, because Todd harbored racial animus. As Plaintiff stated at trial, "Gary [Todd] likes to tell jokes, from what I [*25] hear from Wes [Trotterchaud], and he loves to talk about black this, black that, and he's a racist." (J.A. at 209.) At trial, Trotterchaud testified that on at least two occasions, Todd had mocked African Americans, for instance, by mimicking stereotypical speaking styles of African-Americans.

At trial, Plaintiff also related another incident involving Todd. On a morning, at some point in 2000, Plaintiff and Gregory Owens (who also was a Plaintiff in this action originally) had overheard a conversation between Todd and Trotterchaud, in which Plaintiff and Owens "heard [Todd use] the word nigger." (J.A. at 210) (emphasis in original). When Plaintiff and Owens approached Trotterchaud, after hearing this, Trotterchaud "was kind of bashful at first, and he finally told me [Johnson] -- he didn't go into any details, but he said,

'Man, he mocks the way you-all talk and act.'" (J.A. at 210.)

Regarding this particular incident, Plaintiff testified, "It hurt. In the year 2000 . . . I didn't expect to hear anything like that from a man of his position." (J.A. at 210); *id.* ("The man in his position is the man who ultimately determines what discipline you receive at that center [*26] . . . ."). Plaintiff testified that he "lost trust" in Todd, also because of his perception that "blacks started getting fired once they arrived [at the Chatanooga center]." (J.A. at 211.)

Additionally, there was a November 1999 incident in which, while making racial comments, white employee John Althoff hit black employee Eddie J. Thomas, Jr. in the face with a package. Plaintiff offered trial testimony regarding this incident; he was aware of the incident although he was not present when it occurred. At some point prior to the incident, Althoff had made racial comments that led to his being suspended for two weeks. Althoff was suspended for only one day for the incident involving Thomas, even though under Defendant's zero tolerance policy Althoff could have been terminated. Thomas was later terminated for falsifying his employment application. At trial, Thomas testified that Althoff had initiated all physical contact between the two of them. There is no indication that Defendant ever offered other employees any explanation for the lenient treatment of Althoff, such as a finding that Thomas had somehow provoked Althoff.

Finally, Plaintiff points to other incidents involving Burtnett. [*27] According to Trotterchaud, Burtnett and others attempted to discipline Plaintiff for wearing his prescription sunglasses while indoors. Also, Burtnett approached Plaintiff about taking too long for his deliveries, even though Johnson was ahead of schedule at the time.

Plaintiff also testified that the overall situation led him to seek "professional help" and caused him to revise his earlier plan to work at Defendant until retirement. (J.A. at 230.)

The various considerations of *Harris v. Forklift* must be examined. The frequency of discriminatory conduct was considerable, over the time period in question. n5 The fact that Althoff received only meager punishment for striking Thomas in the face with a package, while emitting racial slurs, made the workplace somewhat "physically threatening." *Harris v. Forklift Sys.*, 510 U.S. at 23.

n5 In or about July 1999, Todd "said he's tired of African Americans complaining." (J.A. at 201.) The July 20, 1999 grievance described

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 31 of 36

Page 8

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

Burtnett's accusations of "time stealing" and Trotterchaud's description of Todd's racial humor and animus. Althoff struck Thomas, while making racial slurs, in November of 1999. Todd allegedly used the word "nigger" at some point in 2000.

[*28]

It is also true that the discriminatory conduct was severe. Case law makes clear that the use of the word "nigger," even taken in isolation, is not a "mere offensive utterance." *E.g., McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1116 (9th Cir. 2004); *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir. 2001). In the instant case, the fact that the slur was allegedly uttered by the division manager, Todd, would greatly increased its severity.

Burtnett's accusation of Plaintiff's "stealing time" was also severe because, standing alone, it would have provided grounds for immediate termination. Nor can we discount Todd's statement, directed at Plaintiff, that "he's tired of African Americans complaining." (J.A. at 201.) The fact that, as division manager, Todd was such an integral figure in the grievance process--and expressed this racially-derogatory comment *in the context of responding to Johnson's July 2000 grievance*--is significant.

Viewing the evidence in the light most favorable to Plaintiff as the nonmovant, the conditions of employment were altered, by an environment of management hostility towards African-Americans. Plaintiff's [*29] subjective feelings of hurt and loss of trust were objectively reasonable.

In rebuttal, Defendant argues that there is no evidence that certain of Burtnett's actions toward Plaintiff Johnson were racially motivated. This is true; however, incidents cannot be viewed individually but rather must be seen in the totality of the circumstances. *Harris v. Forklift Sys.,* 510 U.S. at 23. n6

n6 Contrary to the dissent's approach, incidents of harassment which appear on the surface to be race neutral should not be singled out, but rather should be analyzed in context and as part of the totality of the circumstances. *See Williams v. General Motors Corp.,* 187 F.3d 553, 563 (6th Cir. 1999) ("This totality-of-the circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action.")

There were certain incidents that clearly established racial harassment. Regarding Plaintiff's testimony as to having overheard Todd use the word "nigger" during a [*30] conversation with Trotterchaud, Defendant points out that Trotterchaud would not confirm this at trial. (J.A. at 292) ("I don't recall him ever using inappropriate language."). Defendant also points to Plaintiff's failure to establish the context in which the word was used; Defendant goes so far as to speculate, "In fact, Todd may have been admonishing Trotterchaud not to use the word." (Respondent's Br. at 41 n.11.)

Defendant's arguments regarding Todd's alleged use of the word "nigger" would be permissible before a jury, but these arguments have no relevance in the present proceeding. In ruling on a motion for judgment as a matter of law, the evidence must be viewed in the light most favorable to the nonmovant. Trotterchaud's failure to recall whether inappropriate language was used is ambiguous--Trotterchaud never testified as to having a good recollection for such matters. Trotterchaud is not African-American and did not necessarily have high sensitivity to such remarks.

Given Todd's other statements regarding African-Americans (the statement that he was tired of complaints by African-Americans and the mocking behavior), the differing testimony regarding Todd's alleged use of [*31] the word "nigger" must be resolved in Plaintiff's favor, in a ruling on Defendant's motion for judgment as a matter of law. It must be assumed that, as Johnson testified, the word was used. Also, given Todd's other statements, it was reasonable for Plaintiff to be upset at the use of this word--instead of believing that the word was used to admonish Trotterchaud. The theory now set forth by Defendant--that Todd used the word to admonish Trotterchaud not to say the slur himself--was not supported by any trial testimony; viewing the evidence in the light most favorable to Plaintiff as the nonmovant we must infer that the term was not used in the manner that Defendant now alleges. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

Defendant states that Todd's alleged mocking of African-Americans is not harassment, because "the only specific example Trotterchaud provided was about Johnson's approach as a union steward, not his race." (Respondent's Br. at 41.) Although Trotterchaud recounted Todd's [*32] mocking of Johnson's approach as a union representative, this mocking was apparently racially oriented. (J.A. at 291) (the mocking of "the way African Americans talk.").

In addition to these arguments, Defendant also cites to an unpublished case, which states, "We have held in the past that the gender-based comments are of diminished probative value when they are not directed at the plaintiff." *Bryant v. Martinez*, 46 Fed. Appx. 293, 297 (6th Cir. 2002) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 761 (6th Cir. 2000)). Defendant argues, based on this authority, that racially derogatory comments are not actionable unless specifically directed at a plaintiff. To be sure, harassment will be more severe if offensive comments were directed at a plaintiff. *Leggett Wire*, 220 F.3d at 760; *Burnett v. Tyco Corp.*, 203 F.3d 980, 984 (6th Cir. 2000).

Nonetheless, Defendant's argument fails. Contrary to the statement in the unpublished *Bryant* opinion, this Court has made clear that a comment need not be "directed at" a plaintiff, in order to constitute harassment. *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999) [*33] ("in the sexual harassment context, this Court has deemed probative remarks that demeaned women generally while not demeaning any one woman in particular."). In fact, *Quanex* also clarified that a plaintiff need not even witness remarks or behavior first-hand, in order to allege that the remarks or behavior contributed to a hostile work environment. *Id.* at 661. Thus, Trotterchaud's telling Plaintiff of Todd's mocking behavior and racial animus provides relevant evidence, n7 which must be taken as credible, viewing the evidence in the light most favorable to Plaintiff as the nonmovant. Hence, Defendant's attempt to diminish the significance of remarks not "directed at" a plaintiff is largely nullified by Quanex's ruling that such remarks can prove relevant.

n7 The statement was admissible under the hearsay exception for an admission by a party-opponent. FED. R. EVID. 801(d)(2).

Additionally, it is significant that certain instances of harassment were, in fact, "directed at" Plaintiff. Todd's [*34] statement about being tired of complaints by African-Americans was directed at Plaintiff, in the context of Plaintiff's discussion of a racial grievance. Also, Burnett's "stealing time" allegation was directed at Plaintiff-although this statement did not explicitly mention race, the statement still may be considered as evidence of harassment, in the totality of the circumstances. *Landrau-Romero v. Banco Popular de P.R.*, 212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim.") (citation omitted); *see also*

*Harris v. Forklift Sys.*, 510 U.S. at 23 (the harassment inquiry evaluates the totality of the circumstances). Viewing the evidence in the light most favorable to Plaintiff as the nonmovant, it would be reasonable to accept Plaintiff's testimony that in actuality Plaintiff was not "stealing time" and thus to infer that Burtnett's allegations were based on stereotyping, i.e., Burtnett made the accusation simply because another African-American employee (Boyd) had recently [*35] been discharged for "stealing time."

Hence, Defendant fails in the argument that the offensive remarks were not directed at Plaintiff. There were certain remarks, directed at Plaintiff, that provide relevant evidence of a hostile work environment, on the basis of race; also, there were other incidents not directed at Plaintiff that nonetheless can be considered, under *Quanex*.

Defendant's rebuttals do nothing to sway our earlier conclusion that, viewing the evidence in the light most favorable to Plaintiff as the nonmovant, there is sufficient evidence to support a finding in favor of Plaintiff. The district court erred in granting judgment as a matter of law to Defendant on Plaintiff Johnson's claim of racial harassment.

## C. Goodwin's claim

Like Plaintiff Johnson, Plaintiff Goodwin testified that he had knowledge of the incident involving Althoff striking Thomas, while emitting slurs. In fact, Goodwin testified as to Thomas' termination.

In making the harassment claim, Plaintiff Goodwin reiterates the allegation (also made in Plaintiff's disparate treatment claim) that Burtnett supervised him too closely, engaging in an excessive number of supervised rides. According [*36] to Trotterchaud's trial testimony, these supervised rides were unpleasant--"I call them 'harassment rides'"--and were directed disproportionately at black employees. (J.A. at 302.) Also, Plaintiff testified at trial that during the course of the attempted suspension (in June of 1999), Burtnett once began "screaming at" Plaintiff to roll down his sleeves, even though white employees were allowed to have their sleeves rolled up. (J.A. at 150.) Here, Plaintiff had contact with Todd, who told him to leave the building.

Plaintiff's testimony described daily employee meetings, each morning, at which African-Americans were given less latitude (than white employees) to interact freely with peers:

> the white guys . . . constantly play. Like, a supervisor wears a suit to work every day. They will take the supervisor's coat, hang it off the television, drag it on the floor . .

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 33 of 36

Page 10

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

. just really cutting up. And then if I'm standing there and perhaps lean to whisper to another black, the meeting will stop, and it's like, "We need your attention." But all of this other chaos . . . goes on daily at the meeting. But as far as blacks go who are there at the meeting . . . there is no talking--"We [*37] need you to be up front. We need you to be paying attention to what we are telling you."

(J.A. at 169.)

Also Plaintiff recounted at trial that in 1994:

when I was off hurt with an injury that management had caused to me, not of my own wrongdoing, Mr. Milligan [who was Plaintiff Goodwin's manager] was calling me during that Christmas holiday, telling me how I was going to have a slim Christmas, and at the same time taking up money for hurt white drivers.

(J.A. at 162.)

Additionally, in 1993, Plaintiff applied for a driver position in the "north center" but was denied the position, which allegedly was awarded to a white driver who had less seniority. (J.A. at 143.) In connection with this situation, Goodwin testified that "one of the drivers asked me was I going to the north center . . . . And Mike Clements, who was the north center manager[,] commented . . ., 'No, he's going to Alton Park, with his own kind,' which is an inner-city projects here in the city." (J.A. at 144.)

Plaintiff testified that the harassment upset him and alienated him, thereby interfering with his family life. Johnson corroborated the effects on Goodwin, stating that the harassment [*38] had altered his previously pleasant demeanor.

Before assessing the merits of Goodwin's claim, a procedural question must be addressed. Goodwin's grievance was filed in March of 2000. While Defendant does not contest that the grievance was filed within the appropriate time period as to more recent charges of alleged harassment, n8 Defendant argues that the grievance filing date precludes consideration of the incidents from 1993 and 1994. Defendant's argument lacks merit; prior acts (outside of the statutory time period) may be considered in evaluating a harassment claim. *AMTRAK v. Morgan,* 536 U.S. 101, 117, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002) ("It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the

statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

n8 *AMTRAK v. Morgan,* 536 U.S. 101, 122, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002) ("a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period -- 180 or 300 days -- set forth in 42 U.S.C. § 2000e-5(e)(1).").

[*39]

Under the totality of the circumstances inquiry, the harassment experienced by Plaintiff was pervasive. Overall, there was trial testimony as to at least six forms of harassment: (1) Althoff striking Thomas, while emitting slurs; (2) closely supervised rides by Burtnett, which were directed disproportionately at black employees; (3) Burtnett's "screaming at" Plaintiff to roll down his sleeves, when white employees were allowed to wear their shirts with their sleeves up; (4) the daily employee meetings with closer supervision of African-Americans than white employees; (5) a manager, Milligan, commenting that the injured Goodwin would have "a slim Christmas," while Milligan was collecting money for injured white drivers; and (6) a manager, Clements, making comments that Plaintiff's assignment would put him "with his own kind." But there were far more than six instances of alleged harassment, taking into account the restrictive supervision that occurred each morning, at the daily employee meetings. n9

n9 The dissent mischaracterizes Plaintiff Goodwin's evidence of harassment, claiming that Goodwin offers two "minor" complaints relating to white employees horsing around and being allowed to roll their sleeves up. This clearly ignores the amount of evidence Goodwin offered, as well as the severity of the mentioned incidents. By discounting or failing to acknowledge Goodwin's evidence, the dissent incorrectly argues that Goodwin is merely attempting to "piggyback" on Johnson's claim. However as we have noted, Goodwin presented testimony on at least six different incidents of pervasive harassment.

[*40]

Overall, there was sufficient evidence to harassment to support Plaintiff's claim. Due in part to the daily

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 34 of 36

Page 11

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

restrictions, the frequency of the harassment was great. As stated in the analysis of Plaintiff Johnson's claim, the Althoff incident created a threatening work environment. Burtnett's screaming would have been intimidating to a reasonable person. Other incidents, such as the "slim Christmas" comment, were humiliating. There was hostility in the closer discipline at the morning meetings, and the "his own kind" comment. Under the totality of the circumstances, there was sufficient evidence such that it would have been reasonable for a jury to find that Plaintiff Goodwin experienced a racially hostile work environment.

The district court erred in granting judgment as a matter of law to Defendant on the claims of racial harassment of both Plaintiff Johnson and Plaintiff Goodwin.

## CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's grant of judgment as a matter of law as to Plaintiffs' disparate treatment claims, and we **REVERSE** the district court's judgment and **REMAND** for a new trial on Plaintiffs' hostile work environment claims under [*41] Title VII and the Tennessee Human Rights Act.

## CONCURBY: RONALD LEE GILMAN

## DISSENTBY: RONALD LEE GILMAN

## DISSENT:

**RONALD LEE GILMAN, Circuit Judge.** I concur in Part I of the majority opinion regarding Johnson's and Goodwin's disparate treatment claims. But I disagree with the majority's conclusion in Part II that the district court erred in granting judgment as a matter of law to UPS on Johnson's and Goodwin's claims of racial harassment.

Johnson cites seven occurrences to support his claim of racial harassment: (1) Todd's alleged use of the word "nigger" in an unknown context, (2) Todd's mimicking the way African-Americans speak, (3) Burtnett's references to someone "hauling" Johnson around, (4) Burtnett's admonishment of Johnson regarding "stealing time," (5) the failure of the UPS management to respond to Johnson's complaints, (6) Burtnett's request that Johnson remove his sunglasses, and (7) Burtnett's request that Johnson not move his name on the work assignment board.

All of the allegedly offensive actions on Burtnett's part are facially neutral from a racial viewpoint. Johnson has not demonstrated, for example, that he was asked to remove his sunglasses because of race. I therefore find [*42] it difficult to conclude, without additional evidence, that Burtnett's actions were motivated by racism. Conduct composed primarily of race-neutral disputes relating to discipline, work assignments, training, and other work-related issues does not rise to the level of an actionable hostile work environment. *Cf. Bowman v. Shawnee State Univ.,* 220 F.3d 456 (6th Cir. 2000) (holding that certain offensive acts could not be considered in the hostile-environment analysis because the plaintiff did not show that the harassment had an anti-male bias).

As for Todd's actions, which *were* racially based, I find it equally hard to conclude that the conduct alleged was so "severe and pervasive" as to "unreasonably interfere[] with [Johnson's] work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). According to the Supreme Court, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998) (internal citations omitted).

The majority makes much of Todd's isolated [*43] and unexplained use of the word "nigger" to a third party, but the cases it relies on to support the significance of this racial slur are readily distinguishable. In *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103 (9th Cir. 2004), for example, the plaintiff was subjected to extreme verbal insults, racist graffiti, an inability to collect overtime pay, and his supervisor's refusal to ensure that his vehicle received necessary maintenance, which ultimately resulted in a serious automobile accident. Likewise, in *Spriggs v. Diamond Auto Glass,* 242 F.3d 179 (4th Cir. 2001), the plaintiff was directly exposed to his supervisor's highly offensive racist comments on a daily basis.

The totality of the alleged conduct here, while certainly unwelcome and offensive, occurred only a few times over a period spanning several years. Johnson has therefore failed to show that Todd's purported actions were common or ongoing. This court has held that conduct far more severe and pervasive than that alleged by Johnson is not sufficient to create a hostile work environment. In *Smith v. Leggett Wire Co.,* 220 F.3d 752 (6th Cir. 2000), for example, the plaintiff [*44] testified that his coworkers and supervisors regularly made racially discriminatory comments and racially-motivated threats in his presence and circulated a crass cartoon captioned "How a Black Man Commits Suicide" around the plant. Yet this court reversed the jury's verdict for the plaintiff, holding that the conduct was "simply not 'severe or pervasive enough' to create an objectively hostile work environment." *Id.* at 760. If the conduct at issue in *Smith* did not rise to the level of racial

Case 1:02-cv-00496-WOB    Document 27-2    Filed 06/30/2005    Page 35 of 36

Page 12

2004 U.S. App. LEXIS 23795, *; 2004 FED App. 0079N (6th Cir.)

harassment, then Todd's actions here also fall short of this standard. *Cf. Burnett v. Tyco Corp.,* 203 F.3d 980 (6th Cir. 2000) (holding that three allegations of sexual harassment, although offensive, did not give rise to a genuine issue of material fact regarding whether the conduct was sufficiently pervasive to create a hostile work environment because they occurred over a six-month period of time).

As for Goodwin's racial harassment claim, it is essentially an attempt to piggyback on Johnson's claim. But Goodwin was not even aware of the incidents in question at the time they occurred. These incidents are therefore not relevant to his claim of racial harassment. [*45] *Cf. Abeita v. Transamerica Mailings, Inc.,* 159 F.3d 246, 249 n.4 (6th Cir. 1998) (noting that testimony showing that a company president had made comments outside of the plaintiff's presence was irrelevant to the plaintiff's claims because she was unaware of the comments at the time).

Goodwin also complains that white employees were allowed to horse around, but that black employees were not, and that he was required to roll his sleeves down while white employees were not required to do so. These minor complaints, however, simply do not rise to the level of workplace harassment based on race as mandated by *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (internal citations omitted).

Accordingly, I would **AFFIRM** the decision of the district court.

## TABLE OF CONTENTS

Exhibit

Affidavit of James R. Hearns, Jr....................................................................A

Statement of Ramone Humhrey.....................................................................B

Letter from Unified Sports Management, Inc.......................................................C

Affidavit of Teresa George...........................................................................D

Affidavit of Barbara Chaney.........................................................................E

*Johnson v. UPS*, 2004 U.S. App. LEXIS 23795 (6th Cir.)(unreported)............................F